18 A.3d 890

**BEKA INDUSTRIES, INC.**

v.

**WORCESTER COUNTY BOARD OF EDUCATION.**

**No. 47, Sept. Term, 2010.**

Court of Appeals of Maryland.

April 26, 2011.

David D. Gilliss (Eric G. Korphage and Sean P. Foley of Pike & Gilliss, LLC, Timonium, MD), on brief, for petitioner/cross-respondent.

James W. Almand (Ayres, Jenkins, Gordy & Almand, P.A., Ocean City, MD), on brief, for respondent/cross-petitioner.

Leslie Robert Stellman (Shani K. Whisonant of Hodes, Pessin & Katz, P.A., Towson, MD), on brief, for respondent/cross-petitioner.

William M. Huddles, Esq., Kenneth K. Sorteberg, Esq., Huddles Jones Sorteberg & Dachille, PC, Columbia, MD, for Amicus Curiae brief of Associated Builders and Contractors, Inc., Baltimore, Metro Chapter, and the Surety & Fidelity Association of America.

Adam C. Harrison, Esq., Eli Robbins, Esq., Harrison Law Group, Towson, MD, for Amicus Curiae brief of American Subcontractors Association, the American Subcontractors Association of Baltimore, and the D.C. Metropolitan Subcontractors Association.

John E. Bloxom, Esq., County Atty., Snow Hill, MD, for Amicus Curiae brief of County Commissioners of Worcester County, Maryland.

Stephen C. Bounds, Esq., Director of Legal and Policy Services, Maryland Association of Boards of Education, Annapolis, MD, for Amicus Curiae brief of Maryland Association of Boards of Education.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

GREENE, J.

This case arises from a written contract dispute between Beka Industries, Inc. ("BEKA") and the Board of Education of Worcester County ("the County Board").[1] Between 2004

---

1. The statutory nomenclature for a county board of education is "Board of Education of (insert name) County." Md Code (2008 Repl.Vol.),

and 2006, BEKA was one of twenty trade contractors to be awarded a lump sum contract to contribute to the construction of a new public school, Ocean City Elementary School, in Worcester County. Dissatisfied with the method and amounts of the County Board's payment for its work, BEKA filed suit in the Circuit Court for Worcester County and obtained a judgment against the County Board. The County Board appealed that judgment to the Court of Special Appeals and succeeded in obtaining a reversal of the judgment and an order for a new trial. BEKA has appealed the intermediate appellate court's judgment and before us contends that the trial court's judgment should be fully reinstated. We affirm the Court of Special Appeals's judgment that a new trial is warranted because the County Board was precluded from presenting evidence on its recoupment claim and BEKA may have been awarded impermissible "delay damages" under the contract. But, we reverse the intermediate appellate court's holding that the County Board's governmental immunity is not waived unless and until BEKA proves that there is a funding mechanism to satisfy a judgment for money damages rendered against the Board. Accordingly, we affirm in part, reverse in part, and remand the case to the intermediate appellate court with direction to remand to the Circuit Court for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 8, 2004, the County Board executed a written contract with BEKA to perform site clearing, excavation, grading, site utilities, curb and gutter work, and paving for a new elementary school. The "lump sum bid" proposed for the work by BEKA and accepted by the County Board was $1,856,000. Subsequent to execution of the contract, the parties agreed to three approved change orders, totaling $105,913, that increased the total contract price to $1,961,913.

---

§ 3–104(a) of the Education Article. Thus, we use that denomination here even though the Petition, Conditional Cross–Petition, and Briefs reference the "Worcester County Board of Education." The proper nomenclature was used in the Court of Special Appeals.

BEKA's work on the contract began in June 2004 and was completed by May 2006. During that time, there were numerous disputes regarding BEKA's responsibilities under the original contract as well as the monetary consequences of modifications made by the County Board. To date, the Board has paid BEKA a total of $1,421,852.

Alluded by resolution to their dispute, BEKA filed a Complaint for Money Damages and Other Relief in the Circuit Court for Worcester County. BEKA's original complaint sought damages in the amount of $1,157,053.75, as well as prejudgment interest, post-judgment interest, costs and attorney's fees. BEKA tabulated that figure alleging that the County Board owed it $361,991.47 under the original contract and an additional $795,062.28 for alterations made to the scope of BEKA's work under the contract. The County Board generally denied liability, raising 12 affirmative defenses in its first Answer; a recoupment claim for "credits, backcharges, and/or setoffs" in the amount of $531,979.52 in its Amended Answer and Counter–Complaint; combining the recoupment claim and the 12 affirmative defenses in its Second Amended Answer; and adding four more defenses to its Third, and final, Amended Answer.[2] The County Board conceded at trial that it owes at least $361,991.47 on the balance of the original contract. Numerous motions were filed during the course of the litigation and are discussed with particularity *infra*.

Following a four day bench trial, the Circuit Court for Worcester County "compromised the claim" between what the trial judge viewed to be BEKA's final claim for $1,215,035,80 (exclusive of prejudgment interest) and the County Board's claim for $505,487 and entered a judgment in favor of BEKA for $1,100,000, excluding prejudgment interest and not awarding attorney's fees or post-judgment interest.[3] The County

---

**2.** The trial judge struck the Board's Counter–Complaint and Amended Answer on September 18, 2008 and then struck the Board's Second and Third Amended Answers on October 6, 2008.

**3.** Neither party has briefed this Court on the particular amounts of money they deem owed under and/or as a consequence of breach of the

Board appealed the judgment and filed a "Motion to Stay Enforcement of the Judgment," which was denied by the trial judge, but granted on appeal on the condition that a *supersedeas* bond be filed in the Circuit Court for Worcester County. The County Commissioners of Worcester County fulfilled the bond requirement and the intermediate appellate court heard the case.

The Court of Special Appeals reversed the judgment of the trial court and remanded the case to the Circuit Court for

contract. BEKA's Complaint alleged 49 counts related to the County Board's nonperformance and breach of the contract. Forty-six counts for breach of contract alleged monetary amounts for proposed-change orders (PCOs) that BEKA was owed. BEKA took the sum owed by the County Board under the original contract, $361,991.47 and the amount owed under 42 PCOs, $795,062.28, to claim $1,157,053.75 in its Complaint. Throughout, BEKA claimed that it was entitled to the balance the County Board owed on the contract, $ 361,991.47. Both parties agreed that this amount was owed and it was undoubtedly awarded as part of the trial court's resolution of BEKA's Motion for Partial Summary Judgment on September 18, 2008. In its Motion for Partial Summary Judgment, BEKA additionally claimed that the County Board undisputably owed it certain additional amounts for PCOs that fell into two categories: 15 PCOs that had been approved in accordance with the contract procedures, but that had not been paid, $18,008.19; and 13 PCOs that the County Board had agreed to satisfy in partial amounts, that were also unpaid, $67,487.05, for a total PCO claim by BEKA of $85,495.24. When the trial court ruled on BEKA's motion, it denied the motion "as it relates to outstanding PCOs[,]" which meant that the amount the County Board would owe on the unpaid PCOs would be litigated at trial and not resolved on summary judgment.

In its Amended Answer, Second Amended Answer, and Third Amended Answers, the County Board tallied its balance owing as $472,093.38 ($1,893,945.53, the original contract price plus approved changes, discounted by executed payments to BEKA of $1,421,852.15) owed on the balance of the original contract and $85,513.90 owed on the 28 PCOs identified by BEKA, for a total amount owed to BEKA of $557,607.28. Therefore, at the start of trial, the County Board believed it owed only $26,527.76 (its accounting of the contract balance and PCO payments owed, discounted by its "credits, backcharges, and/or set-offs"). Before this Court, the County Board now contends that it has paid BEKA all monies owed under the contract, except for the $531,080 that comprises its recoupment claim. The trial judge did not correlate the "final amounts" that he considered in ordering the compromise verdict, i.e., $1,215,035 for BEKA and $505,487, to either BEKA's Complaint or the County Board's Answer and persisting claim for recoupment.

purposes of a new trial. *Board of Ed. v. BEKA,* 190 Md.App. 668, 989 A.2d 1181 (2010). BEKA petitioned for *certiorari* and the County Board filed a conditional cross-petition, both of which were granted, *BEKA v. Worcester County Bd. of Educ.,* 415 Md. 38, 997 A.2d 789 (2010), to address the following questions, rephrased for clarity:

1. Is the doctrine of sovereign immunity applicable to a suit against a county board of education for breach of a written contract?

2. Did the Court of Special Appeals incorrectly apply the abuse of discretion standard in reviewing the trial judge's ruling on BEKA's "Motion *in Limine* to Exclude Evidence of Backcharges?"

3. Did the Court of Special Appeals err by reversing the trial judge's ruling on BEKA's Motion for Partial Summary Judgment precluding the County Board from presenting evidence on its recoupment claim?

4. Did the Court of Special Appeals err as a matter of law by allowing the County Board to raise its recoupment claim when the trial judge had stricken the pleadings that raised the claim?

5. Did the Court of Special Appeals err in determining that the contract contains a broad "no-damages-for-delay" clause in light of other contract provisions allegedly providing for recovery of damages?

6. Did the Court of Special Appeals err in reversing the trial court's judgment because of non-compliance with Md. Rule 2–522(a)?

As Cross–Petitioner, the County Board has asked:

1. Does Md.Code (2006 Repl.Vol.), § 5–518(c) of the Courts and Judicial Proceedings Article ("C.J.P.") apply to contract claims against a county board of education? [4]

---

**4.** The County Board refers to sub-sections (b) and (c) of Md.Code (2006 Repl.Vol.), § 5–518 of the Courts and Judicial Proceedings Article interchangeably in its Brief without reconciling the clear distinction between them. Consequently, the County Board's cross-petition ques-

We answer each question above in the negative. We affirm the Court of Special Appeals's judgment that sovereign immunity is legislatively waived in the action against the County Board based on a written contract for the construction of a public school. We reverse, however, that part of the Court of Special Appeals's holding that requires BEKA to prove a source of funding in order to obtain a judgment at a new trial. Additionally, as discussed *infra*, we affirm the intermediate appellate court's judgment concerning the treatment of the County Board's recoupment claim and concerning procedural defects in the trial court's judgment.

## I. Public School Construction in Maryland

We have recognized there exists "a carefully conceived legislative structure in which the respective powers and limitations of local school boards, the State Board of Education and county governments are delineated and balanced." *Bd. of Ed. v. Montgomery County*, 237 Md. 191, 197, 205 A.2d 202, 205 (1964). The construction of public schools exemplifies those interwoven roles; State and local governments provide funding, and, along with the county boards of education, they provide oversight for the construction of public schools in Maryland.

The Maryland State Board of Education ("MSBE") establishes standards and planning guidance for construction projects and the State Superintendent must approve of all plans for new construction and the remodeling of school buildings exceeding $350,000. Md.Code (2008 Repl.Vol.), §§ 2–205(*l*), 2–303(f) of the Education Article ("E.D."). Annually, the MSBE must submit a public school budget to the Governor including appropriations for the Department itself and for aid to "counties ... for the construction of school buildings." E.D. § 2–205(j); *see also* E.D. § 5–101 (requiring county

---

tion and analysis are somewhat muddled. Sub-section (b) applies only to claims exceeding its mandatory insurance policy or $100,000, if self-insured, and sub-section (c) applies to claims of $100,000 or less. Here, the claim is clearly for more than $100,000 and so if C.J.P. § 5–518 applied it would be subsection (b).

boards to submit an annual budget including "estimated receipts" and "requested appropriations" for local school construction that has been approved by the local government). The Interagency Committee on School Construction, established by the Board of Public Works pursuant to E.D. § 5–302, provides a recommendation to the Board of Public Works on which submitted, locally approved construction projects should be funded through the Public School Construction Program. The General State School Fund, established by E.D. § 5–201, is a source of funding for school building construction aid described in E.D. § 5–301(c), which requires the State to pay the excess costs above available federal funds for approved school construction projects or improvements.

County boards of education may undertake the construction of public school buildings as long as the plans conform to the "bylaws, rules and regulations of the State Board" and to the regulations of the Board of Public Works related to alternative financing, when applicable. *See* E.D. §§ 4–115(b), 4–126. The procurement of bids from contractors for school construction contracts, which is addressed in § 5–112 of the Education Article, is administered by county boards. The local county governments meet the requirements of the county board's approved annual budgets by levying and collecting taxes in their jurisdictions and appropriating revenues from other sources. *See* E.D. §§ 5–104, 5–107; *see generally Montgomery County*, 237 Md. 191, 205 A.2d 202 (1964). Once appropriated, county boards must keep school construction funding isolated in a separate and independent account. *See* E.D. § 5–305.

The State, the State Superintendent, the county governments, and the county boards of education are all subject to school construction-related regulations promulgated by the Board of Public Works found in COMAR Title 23.03.02, *et seq.* (2011) ("Administration of the Public School Construction Program"). *See* E.D. § 5–301(g)(1). Clearly, in light of the aforementioned statutory provisions, "[s]tate law provides for close supervision of county boards with regard to construction

of school buildings." *Patterson v. Ramsey,* 413 F.Supp. 523, 530 (D.Md.1976), *aff'd,* 552 F.2d 117 (4th Cir.1977).

## II. Sovereign Immunity

■ Here, the County Board has been sued for breach of contract, and lacking money (or the ability to raise money on its own) to pay a judgment, the Board contends that the doctrine of sovereign immunity bars the suit. The doctrine of sovereign immunity "prohibits suits against the State or its entities absent its consent." *Magnetti v. University of Md.,* 402 Md. 548, 557, 937 A.2d 219, 224 (2007) (citing *Dep't of Natural Resources v. Welsh,* 308 Md. 54, 58–59, 521 A.2d 313, 315 (1986)); *see also Proctor v. WMATA,* 412 Md. 691, 709, 990 A.2d 1048, 1058 (2010) (stating that sovereign immunity is applicable to the State, and its agencies and instrumentalities); *Stern v. Board of Regents,* 380 Md. 691, 700, 846 A.2d 996, 1001 (2004) ("The doctrine of sovereign immunity has long been recognized as applicable in actions against the State of Maryland and its official representatives.").

■ In order to determine if the doctrine of sovereign immunity applies to the County Board in the underlying contract suit, we ask: "(1) whether the entity asserting immunity qualifies for the protection; and if so, (2) whether the legislature has waived immunity either directly or by necessary implication, in a manner that would render the defense of immunity unavailable." *Magnetti,* 402 Md. at 557, 937 A.2d at 224 (quoting *ARA Health v. Dept. of Public Safety,* 344 Md. 85, 92, 685 A.2d 435, 438 (1996)); *see also Austin v. City of Baltimore,* 286 Md. 51, 69–71, 405 A.2d 255, 264–66 (1979) (Eldridge, J., concurring in part, dissenting in part) (describing the legislative origins of sovereign immunity and the resulting deference to that body regarding waivers of the doctrine). A legislative waiver of sovereign immunity, notably, is ineffective unless "there are 'funds available for the satisfaction of the judgment' or the agency has been given the power 'for the raising of funds necessary to satisfy recovery against it.'" *Stern,* 380 Md. at 701, 846 A.2d at 1001–02

(quoting *University of Maryland v. Maas,* 173 Md. 554, 559, 197 A. 123, 126 (1938)).[5]

BEKA asserts that even if the County Board is entitled to sovereign immunity, that doctrine has been legislatively waived for its contract claim pursuant to Md.Code (2009 Repl.Vol.), §§ 12–201 *et seq.* of the State Government Article ("S.G.").[6] Conversely, the County Board, as Cross–Petitioner,

---

**5.** The applicability of sovereign immunity to bar a claim depends upon three factors: (1) the applicability of the doctrine of sovereign immunity to the governmental entity; (2) a legislative waiver of sovereign immunity; (3) and means to satisfy a judgment. *Board v. John K. Ruff, Inc.,* 278 Md. 580, 590–91, 366 A.2d 360, 366 (1976) (remanding the case for fact finding on the availability of funding to satisfy the judgment) (citations omitted). Contrary to Petitioner's assertion, these three questions remain pertinent despite the statutory scheme provided in 1976 by the enactment of the Sovereign Immunity Act, presently codified at §§ 12–201 through 12–204 of the State Government Article. Petitioner asserts that it was unnecessary for the Court of Special Appeals to consider the third prong, i.e., whether there were funds or a funding mechanism available for the satisfaction of the judgment because S.G. § 12–203 provides the funding mechanism. *Board of Ed. v. BEKA,* 190 Md.App. 668, 692, 989 A.2d 1181, 1195 (2010) (relying on *Stern,* 380 Md. at 700–01, 846 A.2d at 1001–02, which in turn relied on *Ruff,* 278 Md. at 590, 366 A.2d at 366). Conversely, the County Board contends that the *Ruff* test was not abrogated by the statute, and therefore it was still incumbent upon BEKA to prove the availability of funding in order to effect a waiver of the County Board's sovereign immunity.

In our view, on this point, the intermediate appellate court was correct in applying the three-step test set forth in *Ruff,* 278 Md. at 586, 366 A.2d at 363, and reaffirmed by our decision in *Stern,* 380 Md. at 700–01, 846 A.2d at 1001–02. It was necessary for the court to consider first whether the County Board qualified for the protection of sovereign immunity, then secondly whether that protection had been waived by statute, and third whether a judgment could be funded. *See Stern,* 380 Md. at 700–01, 846 A.2d at 1001–02; *Ruff,* 278 Md. at 586, 366 A.2d at 363. Sections 12–201 and 12–203, about which we are presently concerned, do not alleviate the necessity of a judicial determination of their applicability to a dispute because "[i]t is clear that without a specific legislative waiver and appropriation, or taxing power, sovereign immunity is applicable in respect to the State." *Stern,* 380 Md. at 701, 846 A.2d at 1002.

**6.** When the contract was executed on June 8, 2004, Md.Code (2004), §§ 12–201 *et seq.* of the State Government Article was in effect. Here, we reference the current statute codified in the 2009 Replacement Volume because it does not contain substantive changes. *See BEKA,*

asserts that BEKA may obtain only a limited judgment because sovereign immunity applies and has only been legislatively waived for claims of $100,000 or less, or the limits of an insurance policy, pursuant to Md.Code (2006 Repl.Vol.), § 5–518 of the Courts and Judicial Proceedings Article.[7] The County Board contends that when C.J.P. § 5–518 is read together with § 4–105 of the Education Article,[8] there is "little room for the applicability of any other sovereign immunity waiver provision found in State law, including S.G. § 12–201 *et seq.*"

The Court of Special Appeals held that S.G. § 12–201

---

190 Md.App. at 685, 989 A.2d at 1191, fn. 8 (following the same citation format). Section 12–201(a), pertinent to "Actions in Contracts" states:

> (a) *In general.*—Except as otherwise expressly provided by a law of the State, the State, its officers, and its units may not raise the defense of sovereign immunity in a contract action, in a court of the State, based on a written contract that an official or employee executed for the State or 1 of its units while the official or employee was acting within the scope of the authority of the official or employee.

§ 12–201(a) (omitting subsection (b), which limits the waiver of sovereign immunity in contract actions so that "the State, its officers and units are not liable for punitive damages" pursuant to § 5–522(d) of the Courts and Judicial Proceedings Article).

7. Md.Code (2006 Repl.Vol.), § 5–518 of the Courts and Judicial Proceedings Article states, in pertinent part:

> (b) *Claims for more than $100,000.*—A county board of education, described under Title 4, Subtitle 1 of the Education Article, may raise the defense of sovereign immunity to any amount claimed above the limit of its insurance policy or, if self-insured or a member of a pool described under § 4–105(c)(1)(ii) of the Education Article, above $100,000.
> (c) *Claims for less than $100,000.*—A county board of education may not raise the defense of sovereign immunity to any claim of $100,000 or less.

8. Section 4–105 of the Education Article requires that each county board of education carry "comprehensive liability insurance to protect the board and its agents and employees[,]" and provides that county boards of education "shall have the immunity from liability described under § 5–518 of the Courts and Judicial Proceedings Article." Md. Code (2008 Repl.Vol.), § 4–105 of the Education Article. The State Board of Education is required to "establish standards for these insurance policies, including a minimum liability coverage of not less than

applies; however, it also determined that S.G. § 12–203[9] does not provide a funding mechanism for a contract judgment; therefore, according to the intermediate appellate court, because no proof was offered on the County Board's ability to pay a judgment the waiver of sovereign immunity was "ineffective." *BEKA,* 190 Md.App. at 712, 989 A.2d at 1207. Consequently, the intermediate appellate court held that "in the event that there is a new trial, and a judgment is entered against the Board on the contract claims, there will need to be evidence presented, and a factual finding by the Circuit Court, regarding whether there are funds available to satisfy the judgment." *BEKA,* 190 Md.App. at 715, 989 A.2d at 1208.

We shall hold that the legislative waiver of sovereign immunity in S.G. § 12–201(a) is applicable to the Board of Education of Worcester County. Additionally, we hold that S.G. § 12–203 provides a funding mechanism for judgments rendered against the County Board following a waiver of sovereign immunity under S.G. 12–201(a). Thus, suit on a written contract for construction of a public school may be brought against the County Board. Moreover, the limited waiver of sovereign immunity contained in C.J.P. § 5–518 does not apply.

### A. S.G. § 12–201 Waives Sovereign Immunity for the County Board of Education Arising out of a School Construction Contract

■ BEKA advances the contention, which was adopted by the intermediate appellate court, that "in the context of this case, the Board is a "unit" of the State pursuant to S.G. § 12–201, and this statute waives [the County Board's] right to the defense of sovereign immunity in contract actions." *BEKA,*

---

$100,000 for each occurrence." E.D. § 4–105(b); *see also* COMAR 13A.02.01.03 (2011).

**9.** Section 12–203 of the State Government Article states: "To carry out this subtitle, the Governor shall include in the budget bill money that is adequate to satisfy a final judgment that, after the exhaustion of the rights of appeal, is rendered against the State or any of its officers or units." S.G. § 12–203.

190 Md.App. at 709, 989 A.2d at 1205 (footnote omitted).
Conversely, the County Board asserts that "S.G. § 12–201 *et
seq.*, . . . applies only to contract claims against the State, its
officers, and its units" and that local boards of education, the
County Board contends, are not "units" of the State.[10] We
reject the County Board's position and affirm the intermediate
appellate court's conclusion.

First, we must determine "whether the entity assert-
ing immunity qualifies for its protection." *Stern*, 380 Md. at
700, 846 A.2d at 1001–02 (citation omitted). We affirm that a
county board of education, is "a State agency entitled to
governmental immunity." *BEKA*, 190 Md.App. at 694, 989
A.2d at 1196 (citing *Board of Ed. v. Zimmer–Rubert*, 409 Md.
200, 205–06, 973 A.2d 233, 236–37 (2009)) (noting numerous
cases in support of the proposition that the Court of Appeals
has "long considered" county school boards to be State agen-
cies); *see also Chesapeake Charter v. Board of Ed.*, 358 Md.
129, 135–36, 747 A.2d 625, 628–29 (2000) (holding that county
school boards are 'creatures' of the General Assembly and
principally governed by state policies, although not "units" for
the purposes of the State's General Procurement Law).

If a county board of education may benefit from the sover-
eign immunity enjoyed by State agencies, then, necessarily, it
is also subject to statutory restraint on that defense by
operation of a legislative waiver. *See State v. Sharafeldin*, 382
Md. 129, 140, 854 A.2d 1208, 1214 (2004) ("We have held,

---

**10.** At various times, county boards of education have asserted the
predominance of either their "local" or "State" nature depending on
their desired outcome. For example, compare the position of the
Board of Education of Worcester County in the present case with that
of the Board of Education of Anne Arundel County in *Norville v. Board
of Education*, 160 Md.App. 12, 35, 862 A.2d 477, 491 (2004), *vacated,
Board of Ed. v. Norville*, 390 Md. 93, 887 A.2d 1029 (2005), wherein
that Board asserted that "county school boards are the product of the
Legislature," and that "the Court of Appeals has consistently regarded
county school boards as State entities, rather than local agencies[,]" in
order to apply the doctrine of sovereign immunity to a former employe-
e's suit against the Anne Arundel Board for a federal claim of age
discrimination.

consistently, that immunity from suit is 'one of the highest attributes of sovereignty,' and that any waiver of that immunity must come from the Legislature."); *see also* E.D. § 3–104(b)(2) (allowing a county board of education to "sue or be sued"); *see also* C.J.P. § 5–518 (discussed *infra* ). "Title 12 of the State Government Article addresses the liability of state agencies and the scope of the doctrine of sovereign immunity ... contain[ing] separate statutory provisions regarding tort and contract actions." *BEKA,* 190 Md.App. at 695, 989 A.2d at 1197. Alluding briefly to the legislative history of S.G. § 12–201, the Court of Special Appeals concluded that because the Board of Education of Worcester County is a State agency, a "unit" of the State in the parlance of the statute, then the waiver of sovereign liability in contract actions set forth in S.G. § 12–201 was expressly applicable.[11] *BEKA,* 190 Md.App. at 708, 989 A.2d at 1204–05. We agree. Moreover, as required by the statute and cases interpreting the provision, the contract between the County Board and BEKA, irrefutably "was [ (1) ] reduced to writing; and (2) the State employee or official [the County Superintendent on behalf of

---

**11.** The Court of Special Appeals considered the legislative history of S.G. § 12–201, stating:

> The statute, as initially enacted in 1976, waived the defense of sovereign immunity for the State "and every officer, department, agency, board, commission or other unit of State government." Md.Code (1976 Cumm. Supp.), Art. 41, § 10A. When the statute was recodified in the State Government Article in 1984, the statute was revised, providing that it applied to "the State its officers and its units." Md.Code (1984), S.G. § 12–202(a). According to the Report on Senate Bill 50, issued on January 27, 1984, the reason for this change was as follows:
>
> The present law contains numerous lists such as "departments, boards, commissions and other units" or uses terms such as "State agencies" to encompass the listed entities. Throughout the State Government Article, the word "unit" is substituted as a general term for a governmental organization.
>
> The statute included "new language derived *without substantive change.*" Revisor's Note, 1984 Md. Laws, Chap. 284. Accordingly, the word "unit" in what is now S.G. § 12–201(a) encompasses entities deemed to be State agencies. And, as discussed, *supra,* county boards of education generally are considered to be State agencies.

*BEKA,* 190 Md.App. at 708, 989 A.2d at 1204–05 (footnote omitted).

the Board] acted within the scope of his, her, [or its] authority in executing the contract," therefore, the contract was duly executed and falls within the waiver of sovereign immunity provided by S.G. § 12–201(a). *See ARA Health,* 344 Md. at 92, 685 A.2d at 440 (holding that immunity was not waived where a claim did not satisfy the formal requirements of a written contract under S.G. § 12–201(a)).

The County Board contends that the legislative waiver of sovereign immunity contained in S.G. § 12–201 does not apply because a county board of education is neither a State "unit," nor a local government entity,[12] drawing on the distinction made in *Chesapeake Charter* in which Judge Wilner discussed the "hybrid nature" of county boards of education, stating that:

[A]lthough the county boards are generally regarded as State agencies because they are part of the State public education system, are subject to extensive supervision and control by the State Board of Education, and exercise a State function, *from a budgetary and structural perspective, they are local in character. They are not divisions of or units within the State Department of Education. They are subject to the county, not the State, budget process and must justify their budget requests to the county government.* Most of their operational funding comes from the county, not the State, government. When these factors are taken into account, it is clear that the general characterization of county boards of education as State agencies does

---

**12.** Notably, there has never been a common law right to governmental immunity for contract claims against local governments and this is apparently why the County Board chose not to more stridently assert its local character, and instead focused attention on its "hybrid" nature. *See Housing Authority v. Bennett,* 359 Md. 356, 358–59, 754 A.2d 367, 368 (2000) (citing *Harford County v. Bel Air,* 348 Md. 363, 372–73, 704 A.2d 421, 425–26 (1998) ("There is still no common law local governmental immunity in contract actions.")). Furthermore, effective July 1, 1976, a county governed by county commissioners, a chartered county, or code county expressly may not raise the defense of sovereign immunity for actions based upon written contracts. *See* Md.Code (1957, 1973 Repl.Vol., and 1976 Supp.), Article 25, § 1A, Article 25A, § 1A, and Article 25B, § 13A.

not require a finding that they are entities "in the Executive Branch of the State government" for purposes of S.F.P. § 11–101(x).

*Chesapeake Charter,* 358 Md. at 139–40, 747 A.2d at 630–31. The proposition that *Chesapeake Charter* stands for is that a local school board is not a "unit" of State Government for purposes of the General Procurement Law because the "procurement of supplies and services by the county boards of education" in contrast to school construction, has never been subject to the general authority of the Board of Public Works, or the Department of General Services.[13]

---

**13.** Importantly, Judge Wilner noted in *Chesapeake Charter* that while operational funding may be a local issue, school construction funding is not:

The one area in which the Legislature has expressly subjected county school board procurement to supervision and control by the Board of Public Works is *school construction, and that is because, during the last three decades, the State has paid for most of the cost of that construction.* See E.D. § 5–301. The Board of Public Works is authorized to adopt regulations and procedures for the school construction program, and both the county governments and all of the educational agencies, including the county school boards, are expressly made subject to those regulations. E.D. § 5–301(h). That authority is not pursuant to the General Procurement Law, however, but arises from provisions in the Education Article, and it is not complete. The county school boards still let the contracts in accordance with E.D. § 5–112. *See* 76 Op. Atty. Gen. 181, 183 (1991). *Chesapeake Charter,* 358 Md. at 140–41, 747 A.2d at 631, fn. 5; *see also BEKA,* 190 Md.App. at 709, 989 A.2d at 1205 ("As [the Court of Special Appeals] stated in *Norville,* 160 Md.App. at 58–59, 862 A.2d at 505, the Court [of Appeals] in *Chesapeake Charter* 'recognized only a limited exception with respect to budgetary matters and procurement.' It did not change the principle that, generally, a county board of education is a State agency.") (citation omitted).

Moreover, Judge Wilner drew a comparison between cases where the Maryland State Board of Education ("MSBE") exercised supervision over "local" disputes regarding non-construction procurement issues and a case where the MSBE deferred a construction procurement dispute to the Maryland State Board of Public Works ("BPW"), stating:

The State Board of Education has, indeed, entertained appeals from non-school construction procurement decisions made by the county school boards, including decisions regarding school bus contracts. *See, for example, Clyde's Bus Service v. Anne Arundel County Board of Education,* 3 Opinions of MSBE 621 (1984) (affirming cancellation of a school bus contract because [the] contractor was disqualified, due to a vision deficiency, from driving a school bus); . . . *Compare S.B.*

We held in *Chesapeake Charter* that "a county school board is not a "unit" within the meaning of [the General Procurement Law], and accordingly, that [the Maryland State] Board of Contract Appeals ha[d] no jurisdiction over disputes arising from procurement decisions made by those boards." *Chesapeake Charter*, 358 Md. at 145–46, 747 A.2d at 634 (noting that the Education Article retained, despite numerous revisions, distinct statutory procurement requirements for county boards related to the solicitation of school construction contracts); *see also* E.D. § 5–112 (governing the bid process for school construction). Thus, the fine distinction drawn in *Chesapeake Charter* for the purposes of determining whether a school bus contract (a local, operational expense) was governed by the State's General Procurement Law, as highlighted by the County Board and the Maryland Association of Boards of Education as amicus curiae, in this case, does not proscribe the application of S.G. § 12–201(a)'s waiver of sovereign immunity to the County Board in the present contract action.[14]

*Construction Company, Inc. v. Montgomery County Board of Education*, 3 Opinions of MSBE 595 (1984), in which the State Board of Education concluded that a contractor was not required to present a school construction procurement dispute, which involved primarily legal issues, to the County Board before proceeding to court. The Board carefully noted its limited jurisdiction in that area, agreeing to review those matters dealing 'with the proper administration of the school system' but declining to rule on whether the county board's actions 'were contrary to any procurement regulations or requirements of the Maryland State Interagency Committee for School Construction (IAC), which is subject to the Maryland State Board of Public Works, and not [the State Board of Education].' *Id.* at 600. *Chesapeake Charter*, 358 Md. at 144–45, 747 A.2d at 633–34. The MSBE, similarly, declined to hear BEKA's dispute against the County Board in the instant case.

14. Neither party has asserted that the public school construction bidding process, contained in E.D. § 5–112, is at issue here, thus the factual predicate and issue to be resolved here are distinct from *Chesapeake Charter*. We are not precluded by *Chesapeake Charter* from holding here that the county board of education is a State "unit" for purposes of our application of the waiver of sovereign immunity, as stated in S.G. 12–201 *et seq.* In *Chesapeake Charter*, we considered whether the Maryland State Board of Contract Appeals ("MSBCA") had jurisdiction to hear a dispute by a school bus contractor who had lost a bid to provide transportation services in Anne Arundel county. We

### B. Funding the Judgment

■ Before this Court, the parties contest the applicability of S.G. § 12–203 as a funding mechanism to satisfy BEKA's judgment, as well as the status of the *supersedeas* bond filed in the Circuit Court for Worcester County as a stay of execution pending this appeal. Because S.G. § 12–201(a) waives the County Board's sovereign immunity in an action based on a written contract for public school construction, we must ascertain whether the General Assembly intended for a judgment awarded thereunder to be satisfied by funding requested by the Governor as part of a "budget bill" pursuant to S.G. § 12–203. Thus, the issue before us is whether § 12–203 applies to all judgments, or only certain judgments, as it appears the intermediate appellate court concluded. In the later case, it would be necessary to have some intelligible way of discerning which judgments would be the responsibility of the State and which would not.

The Court of Special Appeals held that, pursuant to this Court's decision in *Stern,* and notwithstanding the waiver of sovereign immunity, "the burden of proving the availability of funds to satisfy the judgment is on the party seeking to show a waiver of the defense of sovereign immunity, in this case, BEKA[,]" because "SG § 12–203 does not provide a mechanism for appropriation of State funds to satisfy a judgment against a county board of education." *BEKA,* 190 Md.App. at 710, 712, 989 A.2d at 1205, 1207. The Court of Special Appeals reviewed the record to ascertain if facts were alleged to indicate that the County Board had the means to satisfy the judgment, through taxation or appropriation. *See BEKA,* 190 Md.App. at 712–13, 989 A.2d at 1207. Finding none and concluding that several allegations of sources of funding made by BEKA on appeal had not been made at trial, the intermedi-

---

held that the MSBCA did not have jurisdiction over the dispute because the county board of education was not subject to the State's General Procurement Law and so even though a "procurement contract" was in dispute, the procurement dispute was governed by provisions in the Education Article and not the provisions of the State Finance and Procurement Article, particularly the General Procurement Law.

ate appellate court determined that a new trial would require fact-finding on the issue of availability of funding. *BEKA,* 190 Md.App. at 715, 989 A.2d at 1208. In our view, additional fact-finding is unnecessary because funding is provided by statute.

The Court of Special Appeals concluded that S.G. § 12–203 could not be used to satisfy a judgment, stating:

> To be sure, this provision generally would satisfy the funding requirement for State agencies. As indicated, however, school boards are "unusual," "hybrid" agencies. *See Dean [v. Board of Education of Cecil County* ], 71 Md.App. [92] at 98 [523 A.2d 1059 (1987) ]. These boards, while State agencies for most purposes, "are not normally regarded for structural or budgetary purposes, as units within the Executive Branch of the State government." *Chesapeake Charter,* 358 Md. at 137[, 747 A.2d. at 625].

*BEKA,* 190 Md.App. at 710–11, 989 A.2d at 1206. The Court of Special Appeals determined that S.G. § 12–203 did not apply to the present dispute relying largely upon *Chesapeake Charter.* In that case, we did not consider the sections of the State Government Article, at issue in the present case, because there the parties brought their procurement contract to the Maryland State Board of Contract Appeals ("MSBCA") pursuant to § 15–205 of the State Finance and Procurement Article ("S.F.P."). Consequently, sovereign immunity was not an issue in the case.

In *Chesapeake Charter,* we held that a county board of education's school bus contracts were not subject to the General Procurement Law, because the board was not a "unit" of the Executive Branch of the State Government within the meaning of the pertinent statutory provision, S.F.P. § 11–101(x), and therefore the MSBCA had no jurisdiction over the dispute between the county board and a school bus contractor. *Chesapeake Charter,* 358 Md. at 145–46, 747 A.2d at 634. Determining that the language of the pertinent statute was ambiguous, we considered the legislative history and concluded that, other than school construction, the State Board of Public Works and the Department of General Services had

never "exercised any authority over the procurement of supplies and services by the county boards of education." *Chesapeake Charter,* 358 Md. at 140, 747 A.2d at 631 (footnote omitted, quoted *supra* ).

Accordingly, our holding in *Chesapeake Charter* was a narrow one. We determined that "most of [the county board of education's] operational funding comes from the county, not the State, government" and that "[t]hey are subject to the county, not the State budget process" therefore the school bus contract was a local, and not a State concern. *Chesapeake Charter,* 358 Md. at 139, 747 A.2d at 631. The Court of Special Appeals relied on this reasoning to conclude that, "[b]ecause county boards of education are subject to the county budget process, it does not appear that the State would be responsible for paying a judgment against a county board of education. . . . Accordingly, S.G. § 12–203 does not provide a mechanism for appropriation of State funds to satisfy a judgment against a county board of education." *BEKA,* 190 Md.App. at 712, 989 A.2d at 1207. While we do not disagree that the county board of education must submit a budget to the local government for approval, the funding that is appropriated to fulfill the budget emanates from local, State, and federal sources. This "local budgetary character," therefore, appears insufficient to overcome the overwhelming support in our case law for the notion that county boards of education are "legally State agencies." *See Chesapeake Charter,* 358 Md. at 137, 747 A.2d at 629.

Here, the issue is one of statutory construction because we must determine whether S.G. § 12–203, by its terms, is applicable to the underlying action. We construe S.G. § 12–203 "recogniz[ing] that 'the cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature[,]' " *Stern,* 380 Md. at 720, 846 A.2d at 1013, beginning with a plain meaning analysis in order to "give effect to the statute as it is written[,]" *Pak v. Hoang,* 378 Md. 315, 323, 835 A.2d 1185, 1189 (2003). "[B]ut if the true legislative intent cannot readily be determined from the statutory language alone, we look to other indicia of that intent,

including the title to the bill, the structure of the statute, the inter-relationship of its various provisions, its legislative history, its general purpose, and the relative rationality and legal effect of various competing constructions." *Baltimore County v. RTKL Assoc.*, 380 Md. 670, 678, 846 A.2d 433, 437–38 (2004). We also "avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense." *Zimmer–Rubert*, 409 Md. at 215, 973 A.2d at 243 (quoting *Walzer v. Osborne*, 395 Md. 563, 573, 911 A.2d 427, 432 (2006)). "We have also stated that this Court must read and 'construe legislative dilution of governmental immunity narrowly in order to avoid weakening the doctrine of sovereign immunity by judicial fiat.' " *Magnetti*, 402 Md. at 565, 937 A.2d at 229 (quoting *Stern*, 380 Md. at 720, 846 A.2d at 1012–13).

Section 12–203 of the State Government Article requires that "adequate" funds to satisfy a final judgment "rendered against the State or any of its officers or units" be made available through a "budget bill"[15] after all appellate issues have been resolved. S.G. § 12–203. The provision is intended to "carry out this subtitle," which, as stated, addresses "Actions in Contract." S.G. 12–203. According to the plain language of the statute, and its surrounding provisions relating to governmental immunity in contract suits, there is no indication that § 12–203 differentiates between those judgments that the State must pay and those it must not as long as the legislative waiver of sovereign immunity enshrined in S.G.

---

**15.** A "budget bill" is defined in Article III, § 52(5) of the Maryland Constitution, which states:

The Governor shall deliver to the presiding officer of each House the Budget and a bill for all the proposed appropriations of the Budget classified and in such form and detail as he shall determine or as may be prescribed by law; and the presiding officer of each House shall promptly cause said bill to be introduced therein, *and such bill shall be known as the "Budget Bill."*

Md. Const., Article III, § 52(5). An "appropriation of public funds is made by a constitutional mandate or lawful legislative act whose primary object is to authorize the withdrawal from the state treasury of a certain sum of money for a specified public object or purpose to which such sum is to be applied." *Dorsey v. Petrott*, 178 Md. 230, 245, 13 A.2d 630, 633–34 (1940) (citation omitted).

§ 12–201(a) is applicable to the dispute.[16] *See e.g., Coastal Holding & Leas. v. Maryland Environmental,* 420 F.Supp.2d 441, 444–46 (2006) (holding that the Maryland Environmental Service was immune from suit in federal court based on the "state treasury" factor of the Fourth Circuit's sovereign immunity analysis because the agency successfully argued that S.G. § 12–203 means that the "State of Maryland is ultimately liable for any judgments entered against it in a contract" and likewise for a tort action).

The amount of money that the Governor would be required to include in the budget bill "to satisfy a final judgment" is a factual inquiry and must be determined at trial by reference to the contract provisions and an accounting of payments and reimbursements between the parties. Thus, there is no other burden on BEKA in the instant case to prove the availability of funds, as there was in *Ruff,* and the Court of Special Appeals erred in concluding that BEKA bore that burden.

---

**16.** A foray into the legislative history of S.G. § 12–203 is unnecessary given the clarity of the statute. We point out, though, that in *Baltimore County v. RTKL Assoc.,* 380 Md. 670, 846 A.2d 433 (2004), this Court noted that § § 12–201 through 12–204 of State Government Article were drafted "immediately upon the heels" of a report highlighting the "negligible fiscal impact" upon the State arising from contract suits. *See RTKL,* 380 Md. at 679–682, 846 A.2d at 438; *see also Sharafeldin,* 382 Md. at 138, 854 A.2d at 1213 (noting that the Report of the Governor's Commission to Study Sovereign Immunity, November 1976, addressed "concerns that the waiver of immunity in contract actions might have a significant fiscal impact by increasing liability on the part of the State, not only for contract damages" but also for litigation). Prior to passage of the waiver provisions, the Governor's Commission concluded that, in other jurisdictions, the "abrogation of sovereign immunity in contract actions had produced negligible fiscal impact, because (1) the State had already appropriated the money needed to fulfill the contractual obligation, (2) the contract itself could provide conditions to liability, and (3) 'when the states abrogate sovereign immunity, they do so subject to a number of exceptions and limitations which act to further minimize the fiscal impact.' " *RTKL,* 380 Md. 670, 682, 846 A.2d at 440. Therefore it is clear that upon consideration of the consequences and potential impact to State coffers, the General Assembly and the Governor intended for money judgments to be payable pursuant to S.G. § 12–203 by the State when an authorized contracting entity engaged in a written contract with another party and damages were assessed for violation of that contract.

Moreover, we have previously noted that S.G. § 12–203 was enacted by the General Assembly for the particular purpose of addressing the funding requirement that must precede a waiver of sovereign immunity under S.G. § 12–201(a). In *Stern*, we concluded that the General Assembly enacted S.G. § 12–203 upon an acknowledgment of our reasoning in *Maas*, 173 Md. at 558–60, 197 A. at 125–26 and *Ruff*, 278 Md. at 590–91, 366 A.2d at 366, that sovereign immunity is a valid defense unless funds have been appropriated to pay a judgment or funds may be raised for that purpose, stating:

> The General Assembly is cognizant of how to specifically authorize the power to raise funds in satisfaction of the second prong of the *Maas* and *Ruff* test, as it has enacted a power to appropriate funds for the purpose of paying judgments arising from an express legislative waiver of immunity in Md.Code (1984, 1999 Repl.Vol.), § 12–203 of the State Government Article.

*Stern*, 380 Md. at 715, 846 A.2d at 1010. Therefore, in *Stern*, we considered S.G. § 12–203 to be an explicit funding mechanism for judgments based upon written contracts against the State, its officers, or units. Judge Wilner, dissenting in *Stern* with respect to the majority's analysis of S.G. § 12–201 and concluding that the Board of Regents had in fact breached written contracts with the students by executing a mid-year tuition increase, nevertheless echoed the majority's view of the function and purpose of S.G. § 12–203 stating:

> Section 12–203 of the State Government Article requires the Governor to place sufficient funds in the State budget to discharge the University's obligation. All of the necessary pieces, even under a [*Maas* ] analysis, are thus in place.

*Stern*, 380 Md. at 732, 846 A.2d at 1019 (Wilner, J., dissenting). Judge Wilner noted that " § 12–203 requires the Governor to include in the budget bill money that is adequate to satisfy final judgments," citing § 52(4) and (12) of Article III of the Maryland Constitution. *Stern*, 380 Md. at 732, 846 A.2d

at 1019, fn. 4.[17]

 Section 12–203 applies to the instant case because this Court has determined, *supra,* that its statutory companion, S.G. § 12–201(a), waives the County Board's governmental immunity and the language of S.G. § 12–203 requires that all judgments rendered against the State, its officers or units, upon breach of a written contract shall be requested by the Governor as part of a budget bill. Furthermore, the application of S.G. § 12–203 to written contract disputes between a State entity and a private party is consistent with the purpose of providing a waiver to immunity in contract actions involving written agreements. It gives effect to "the moral obligation on the part of any contracting party, including the State or its political subdivisions, to fulfill the obligations of a contract." *Magnetti,* 402 Md. at 560, 937 A.2d at 227, fn. 6 (quoting 1976 Md. Laws, Ch. 450).[18]

### C. Section 5–518(b) of the Courts and Judicial Proceedings Article does not apply

 The County Board has asserted that the only applicable legislative waiver of its sovereign immunity is exclusively found in C.J.P. § 5–518 because § 4–105 of the Education Article states "a county board of education shall have the immunity from liability described under § 5–518" and this is the only provision in the Education Article that addresses sovereign immunity for county boards of education. E.D. § 4–105(d). Therefore, the Board contends in its cross-peti-

---

**17.** Sub-sections 4 and 12 of § 52 of Article III of the Maryland Constitution require that the Governor provide a Budget that estimates "all appropriations" and permit the Governor to hold hearings to review estimates by agencies and for "all institutions applying for State moneys." *See* MD. CONST., Art. III, § 52(4) and (12).

**18.** Because we have determined that S.G. § 12–203 provides a funding mechanism for the judgment against the County Board, we do not address Petitioner's alternative argument that the *supersedeas* bond is available to satisfy the judgment. Nor do we address Petitioner's argument that sovereign immunity is waived by Article 25B, § 13A of the Maryland Code, which provides a limited waiver of sovereign immunity for code counties.

tion that it is insulated from paying damages to BEKA over $100,000 (or the amount of its insurance policy) pursuant to C.J.P. § 5–518(b) and pursuant to this Court's opinion in *Zimmer–Rubert*, 409 Md. 200, 973 A.2d 233 (2009).

In *Zimmer–Rubert*, in the context of what we perceived to be a claim for personal injury resulting from an alleged age discrimination violation, we commented that the term " 'any claim' [under § 5–518(c) ] cannot reasonably be read to exclude certain categories of claims." *Zimmer–Rubert*, 409 Md. at 215, 973 A.2d at 242 (quoting *Zimmer–Rubert v. Board of Ed.*, 179 Md.App. 589, 612, 947 A.2d 135, 149 (2008)). Our interpretation of § 5–518(c) was clearly in the context of a tort or insurable claim, such as "those for personal injury," and for claims arising from "alleged employment law violations." *Zimmer–Rubert*, 409 Md. at 216, 973 A.2d at 242. We did not imply in that case that C.J.P. § 5–518(c) applies to contract claims, nor did we address, by association, the meaning of C.J.P. § 5–518(b), to which Respondent looks in the present case. Thus, Respondent's contention that *Zimmer–Rubert* interpreted C.J.P. § 5–518 to be applicable to contract claims is incorrect. Moreover, we have found no cases to support the contention that C.J.P. § 5–518(b) applies to contract claims filed against a county board of education. Therefore, we affirm, without the need for further discussion, the Court of Special Appeals's conclusion that C.J.P. § 5–518 does not place limitations on the waiver of sovereign immunity under S.G. § 12–201(a). *See BEKA*, 190 Md.App. at 707, 989 A.2d at 1204 (holding "[t]hus, the language of § 5–518, limiting the liability of a self-insured board of education to $100,000, does not apply to BEKA's contract claims.").

### III. The Propriety of the Trial Court's Treatment of the County Board's Recoupment Claim

At trial, the County Board sought to reduce the amount of money damages awarded to BEKA by asserting its entitlement to "credits, backcharges, and/or set-offs" totaling $531,079.52 arising from PCOs (proposed change orders) num-

bering 1, 2, 3, 4, 14, 15, 17, 18, 19, 40.[19] The County Board
alleged in pleadings, discussed *infra*, that BEKA "refused or
failed to perform certain work in accordance with the [Con-
tract], and [the County Board] had to have that work per-
formed by other contractors[,]" and that BEKA "had certain
work removed from its scope of work by the construction
manager in accordance with the Contract."

The County Board's claim is a "recoupment" claim because
it seeks to adjust the amount awarded to BEKA in light of its
own losses arising out of the same transaction from which
BEKA seeks a legal remedy. *BEKA,* 190 Md.App. at 727, 989
A.2d at 1215–16 (citing *Imbesi v. Carpenter Realty,* 357 Md.
375, 380, 744 A.2d 549, 552 (2000) (where recoupment was
described as "a diminution or a complete counterbalancing of
the adversary's claim based upon circumstances arising out of
the same transaction on which the adversary's claim is
based")); *see The Impervious Products Co. v. Gray,* 127 Md.
64, 68, 96 A. 1, 2 (1915) ("In recoupment a defendant may
show damages equal to some part of the whole of the plain-
tiff's claim and have it deducted from that claim, but can
recover no affirmative judgment."). The Court of Special
Appeals highlighted the equitable nature of a recoupment
claim stating, "[r]ecoupment exists in equity as well as at
common law, and has been said to be *equitable in nature. It
reduces the claim affirmatively urged so far as in reason and
conscience it ought." BEKA,* 190 Md.App. at 727, 989 A.2d at
1216 (quoting *Smith v. Smith,* 79 Md.App. 650, 662, 558 A.2d

---

**19.** In its brief, the County Board contends that its Answers to Interroga-
tories put BEKA on notice of its intention to claim recoupment in the
event of litigation, stating:

> [T]he Board provided a chart with its Answers detailing ten specific
> credits the Board claimed totaling $531,080, the basis for its entitle-
> ment to each credit, and the position BEKA took with respect to each
> item.
>
> Through this early warning, BEKA was on notice, assuming pre-
> litigation discussions and correspondence were insufficient, that the
> Board intended to present evidence and argue at trial that $531,080
> of BEKA's lump sum contract had not been earned due to BEKA's
> non-performance of certain work. Thus the Board wanted to recoup
> the money.

798, 804 (1989) (quoting 20 Am.Jr.2d *Counterclaim, Recoupment and Setoff* § 6 (1965))).

On appeal before this Court, BEKA poses three questions relating to the treatment of the County Board's recoupment claim at trial and before the Court of Special Appeals. Because the questions are factually and procedurally intertwined, we address them together. BEKA first contends that the intermediate appellate court erred by not affirming the portion of the trial court's ruling on BEKA's Motion for Partial Summary Judgment, by which the trial court barred the County Board from "raising the issue." Secondly, BEKA contends that the County Board's use of the defense of recoupment is barred as a matter of law. Finally, BEKA asserts that the intermediate appellate court applied incorrectly the abuse of discretion standard of review to ultimately reverse the trial court's grant of BEKA's "Motion *in Limine* to Exclude Evidence of Backcharges."

BEKA's three questions arise in response to the intermediate appellate court's consideration of a single question posed to it by the County Board, which asked "[d]id the trial court err in prohibiting the County Board from submitting evidence regarding its [$531,079.52] recoupment claim[.]" In finding that the trial judge abused his discretion, the Court of Special Appeals analyzed this question wholly in the context of the trial judge's ruling on BEKA's Motion *in Limine* concluding that it was "unable to determine the basis for the court's ruling excluding the Board's evidence of recoupment[,]" and that "[t]he inherent contradictions in the trial court's statements indicate that there was not a sound exercise of discretion in excluding this evidence." *BEKA,* 190 Md.App. at 729, 989 A.2d at 1216. The Court of Special Appeals held that in its view of the record the trial court's ruling may have been based on a finding that the recoupment issue was not timely asserted and, to that extent, the decision was erroneous because the Board's "initial answer preserved the defense." *BEKA,* 190 Md.App. at 729–30, 989 A.2d at 1216–17. We shall affirm the Court of Special Appeals's resolution of the issues regarding the trial court's treatment of the County Board's

recoupment claim issue because the Board should have been permitted to present evidence of the claim at trial.

## A. Procedural History

The County Board first pleaded its "entitlement" to recoup money owed to BEKA under the contract by way of a Counter–Complaint and Amended Answer filed July 14, 2008. The same "entitlement" claim was presented in four subsequent pleadings: (1) the Second Amended Answer filed July 18, 2008; (2) the response to BEKA's "Motion *in Limine* to Exclude Evidence of Backcharges" filed August 5, 2008; (3) the Third Amended Answer filed August 12, 2008; and (4) the Board's "Response to BEKA's Motion for Partial Summary" Judgment filed August 18, 2008, wherein the Board maintained that no judgment should be entered until the court received evidence concerning certain proposed "amounts, credits, backcharges and setoffs totaling $531,080."

At a motions hearing on September 18, 2008, less than a month before trial, the trial judge struck the County Board's Counter–Complaint and Amended Answer as untimely, stating: "The fact that discovery closed just four days before the County Board's filing of its Countercomplaint unfairly prejudiced BEKA, and the County Board's Countercomplaint and Amended Answer are stricken." [20]

Secondly, the trial judge barred the defense of recoupment by granting that portion of BEKA's Motion for Partial Summary Judgment, in which BEKA argued that the County Board "did not comply with the contract provisions governing changes to BEKA's work under the contract." BEKA assert-

---

**20.** We question whether the trial judge correctly stated the discovery time line in his ruling on the Board's Counter–Complaint and Amended Answer. The scheduling order apparently allowed "amendments to pleadings" up until 20 days prior to the trial date. When the July 14th pleadings were filed, the case was set to commence on August 18th and so the discovery time line would not have been violated. After two postponements, trial began on October 6, 2008. Error or not, it is immaterial because, as we explain *infra*, we remand for a new trial and affirm that the issue of recoupment was raised and preserved by the Board's initial Answer.

ed that there was no dispute of material fact about the failure of the County Board's claim for back-charges, credits or setoffs because: (1) § 4.7.1 of the contract defined a "claim," which BEKA argued clearly included the County Board's recoupment claim; (2) claims must be filed within 7 days and must be substantiated; and (3) claims must be submitted to the Architect for resolution. Therefore, BEKA contended, because the County Board did not submit its "back-charges, credits or setoffs" through this process, it waived its claim. The County Board asserted that there were genuine disputes of the facts related to its claims for recoupment and that the trial court should not enter a money judgment without receiving evidence on the recoupment amounts. The trial judge ruled in BEKA's favor, stating: "As to Beka's Request for Summary Judgment on the issue of credits, back-charges and setoffs, the County Board failed to address Beka's argument that it did not adhere to the contract provisions for asserting a claim and the County Board should be precluded from raising the issue at this time."

Prior to commencement of trial, on October 6, 2008, the trial judge struck the County Board's Second and Third Amended Answers, which each raised recoupment, and the court ruled explicitly on BEKA's Motion *in Limine*, stating that: "I'm going to bar any evidence of recoupment as an affirmative answer."

## B. Summary Judgment

BEKA asks us to determine whether it was error for the Court of Special Appeals to, in effect, reverse the trial court's grant of BEKA's Motion for Partial Summary Judgment. Because the Court of Special Appeals did not consider expressly the trial court's ruling on BEKA's Motion for Partial Summary Judgment, but rather limited its discussion of the County Board's recoupment claim to the context of the trial court's ruling on BEKA's Motion *in Limine, BEKA,* 190 Md.App. at 727, 989 A.2d at 1216, there is no analysis stated in the intermediate appellate court's opinion regarding the trial court's ruling on summary judgment for this Court to review.

The intermediate appellate court did not engage in de novo review, which would have inquired into whether the trial judge's ruling pertaining to the recoupment claim was legally correct. *See e.g., Dashiell v. Meeks*, 396 Md. 149, 163, 913 A.2d 10, 18 (2006) ("With respect to the trial court's grant of a motion for summary judgment, the standard of review is de novo.") (citing *Rockwood Cas. Ins. Co. v. Uninsured Employers' Fund*, 385 Md. 99, 106, 867 A.2d 1026, 1030 (2005)). Upon our review of the grant of the summary judgment motion, however, we conclude that the trial judge was legally incorrect to have granted BEKA's motion as to the County Board's recoupment claim. "Prior to determining whether the trial court was legally correct, an appellate court must first determine whether there is any genuine dispute of material facts.... Any factual dispute is resolved in favor of the nonmoving party.... Only when there is an absence of a genuine dispute of material fact will the appellate court determine whether the trial court was correct as a matter of law." *Dashiell*, 396 Md. at 163, 913 A.2d at 18 (citations omitted).

The facts relevant to the recoupment claim were disputed and therefore the issue should not have been resolved by summary judgment. The County Board claimed it was owed back-charges for ten proposed change orders ("PCOs"), presented to the trial court as Exhibit 2 in BEKA's Motion for Partial Summary Judgment, restated in the County Board's "Response to Motion for Partial Summary Judgment," and in its "Supplement to Defendant's Response to Motion for Partial Summary Judgment." BEKA asserted that the contract required certain claims procedures, namely provisions 4.7.1, 4.7.2 and 4.7.3, to be followed to pursue such credits, but that the County Board did not follow those procedures. The County Board claimed that it was not required to submit the credits through the claims procedure in the contract. Moreover, it argued that the two contract provisions, 4.7.4 and 5.7.1. permitted the withholding of payment on uncontested amounts until all unsettled claims were determined. The trial judge ruled that because "the Board failed to address Beka's argument that it did not adhere to the

contract provisions for asserting a claim ... the Board should be precluded from raising the issue at this time." In our view, the trial court erred in arriving at this legal conclusion despite several disputed, material facts concerning legal requirements of the contract; the impact of contract modifications made by the parties; the timeliness of submissions of claims to the architect prior to litigation; and the precise monetary amounts owed to BEKA because of changes to its scope of work or credits for nonperformance owed to the County Board.

Even if there were no disputed material facts the trial judge's conclusion that the County Board "failed to address Beka's argument that it did not adhere to the contract provisions for asserting a claim," is not supported by the record.[21] The record indicates that the County Board did in fact address the issue of compliance with the contract procedures in at least two pleadings, the "Response to Motion for Partial Summary Judgment" and the "Supplement to Defendant's Response to Motion for Partial Summary Judgment."

## C. Recoupment Claim Not Barred as a Matter of Law

The Court of Special Appeals suggested that on remand the [trial] court can address the contention that the Board is not entitled to present its recoupment defense because it failed to follow the procedures set forth in the contract for asserting a claim. Neither party addressed whether a defense of recoupment, as opposed to an affirmative complaint, would be subject to the claims procedure set forth in the contract.

*BEKA,* 190 Md.App. at 730, 989 A.2d at 1217, fn. 37. In our view, this statement likely prompted BEKA's second argu-

---

21. In this Court, BEKA asserts that the trial judge found that the County Board had "failed to follow the terms and conditions required by the contract." The record, however, does not reflect that assertion, but suggests that the trial judge concluded only that the County Board did not provide argument on the point. In our view of the record, the trial judge did not make a finding about whether the Board's actions had violated the contract.

ment that, in effect, the distinction described by the intermediate appellate court is irrelevant and would not need to be addressed on remand. BEKA asserts that because the trial judge struck the County Board's Counter–Complaint, which included its recoupment claim as a cause of action against BEKA, the County Board had no legally, subsisting affirmative claim for recoupment and therefore the "defense" of recoupment was barred as a matter of law. BEKA argues, "[i]n other words, if the defendant has no legally subsisting cause of action, the defendant should not be able to counterbalance or diminish the plaintiff's claim through the defense of recoupment." [22]

As BEKA notes, the intermediate appellate court did not address this issue directly because it only considered the propriety of the trial judge's ruling on BEKA's motion in limine. The Court of Special Appeals indirectly indicated, however, that the trial judge's ruling to strike the Counter–Complaint (and the later exclusion by granting BEKA's Motion *in Limine*) had no impact on the recoupment claim because it was implied and preserved by the County Board's initial answer. *BEKA,* 190 Md.App. at 729–30, 989 A.2d at 1217 (holding that recoupment need not be specifically pled under Md. Rule 2–323(d) and therefore it was timely raised and preserved for appellate review by the County Board's initial answer).

BEKA relies on *Imbesi* to support this assertion; however, that case did not address recoupment, but rather a set-off claim [23] in an unrelated transaction that was statutorily barred

---

**22.** The County Board filed a separate Complaint against BEKA alleging the "same backcharges" in the Circuit Court for Worcester County on September 26, 2008, just prior to the October 6, 2008 trial date in the present litigation, which complaint was dismissed on October 2, 2009 on the grounds of *res judicata.* The Court of Special Appeals heard the present case on November 4, 2009 and issued its opinion on February 26, 2010.

**23.** A set-off claim, contrary to a recoupment claim, is a "diminution or a complete counterbalancing of the adversary's claim based upon circumstances arising out of a transaction *other than that on which the*

by a provision of the Estates and Trusts Article of the Maryland Code. *Imbesi*, 357 Md. at 392, 744 A.2d. at 558 ("Whether the result is the same if the estate's debtor raises recoupment is an issue that need not presently be decided."). Thus, *Imbesi* does not assist with the resolution of the treatment of the County Board's recoupment claim in the instant case. BEKA also calls our attention to *Cohen v. Karp*, 143 Md. 208, 122 A. 524 (1923), where this Court noted that a set-off to a judgment was a defense that could be raised if the defendant had "a right to receive the amount due him from the plaintiff, [and] his claim ... [is] of such a nature that he can sue for and recover it in a court of law." *Cohen*, 143 Md. at 211, 122 A. at 525 (noting that "[t]he defense of set-off, technically, means a cross-claim"). Finally, BEKA relies upon *Telmark, Inc. v. C & R Farms, Inc. et al.*, 115 A.D.2d 966, 966–67, 497 N.Y.S.2d 536 (1985) in which a New York intermediate appellate court held that because of the express terms of a lease agreement " 'under no circumstances' ... [could] the defendants have a cause of action against plaintiff for consequential damages, [therefore] they cannot assert such claim in recoupment."

In *Telmark*, unlike the instant case, a lease agreement between the parties contractually precluded the defendants from suing the plaintiff for consequential damages and so recoupment could not be used as a "back-door" mechanism for raising the issue. *Telmark*, 115 A.D.2d at 966–67, 497 N.Y.S.2d 536. Similarly, in *Imbesi* the preclusive effect of a statutory bar to a set-off claim (not a recoupment claim) was dispositive. *Imbesi*, 357 Md. at 392, 744 A.2d at 558. In *Cohen*, again a case about set-offs and not recoupment, this Court held that the trial judge erred in not granting a motion to arrest a judgment because the plaintiff had been ordered erroneously to pay co-defendants the excess of their set-off claim against him. *Cohen*, 143 Md. at 212–13, 122 A. at 525. *Cohen*, therefore, does not apply here.

------

*adversary's claim is based ...." Imbesi v. Carpenter Realty*, 357 Md. 375, 380, 744 A.2d 549, 552 (2000) (emphasis added).

Here, there was no factual conclusion on the record about whether the contract would apply to the County Board's recoupment defense for "back-charges, credits and/or set-offs," as the Court of Special Appeals correctly pointed out. *BEKA,* 190 Md.App. at 729, 989 A.2d at 1217. Because we hold that the trial judge's rulings precluding the County Board from presenting its evidence on recoupment were in error, and the question of whether the contract precludes a claim by the County Board for "back-charges, credits and/or set-offs" remains unresolved, we hold that the recoupment issue, whether a "defense" or "affirmative claim," is not barred and in fact must be addressed in a new trial.

## D. Motion *in Limine*

To address BEKA's third argument, we consider whether the Court of Special Appeals erred by holding that the trial judge abused his discretion when he granted BEKA's "Motion *in Limine* to Exclude Evidence of Defendant's Backcharges." As the Court of Special Appeals noted, we have said also that

[j]udicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. *State v. Wilkins,* 393 Md. 269, 279, 900 A.2d 765, 771 (2006) (citing *Gunning v. State,* 347 Md. 332, 351, 701 A.2d 374, 383 (1997)).

*BEKA,* 190 Md.App. at 727–28, 989 A.2d at 1216. BEKA asserts that there was no abuse of discretion because the trial judge had already barred the recoupment defense in his grant of its Motion for Partial Summary Judgment, the trial judge had granted all motions striking the County Board's amended pleadings that raised recoupment, the County Board had committed discovery violations warranting exclusion of the evidence, and even if BEKA had the recoupment information it did not know that the County Board was going to use the credits as an affirmative claim or affirmative defense. Conversely, the County Board asserts that the Court of Special

Appeals was correct to find abuse of discretion because the trial judge excluded the evidence without commenting or engaging in any fact finding on the disagreement between opposing counsel on the allegation of discovery violations, the County Board's responses to BEKA's motion identified sources of information substantiating the recoupment claim dating back to February 2008 (well before the commencement of trial), and that the trial judge should have taken a more conservative approach in responding to the discovery dispute under Md. Rule 2–433 ("Sanctions.").

BEKA's motion *in limine* was based entirely on allegations that the County Board violated unspecified discovery rules. Recently, we have stated:

> The decision as to which remedy or sanction to impose [for a discovery violation] generally rests within the broad discretion of the trial court. *See Thomas v. State,* 397 Md. 557, 570, 919 A.2d 49, 57 (2007). . . . Ordinarily, a court will "impose the least severe sanction that is consistent with the purpose of the discovery rules." *Thomas,* 397 Md. at 571, 919 A.2d at 58. This Court has explained that in remedying a discovery violation, the court should weigh ["](1) the reasons why the disclosure was not made; (2) the existence and amount of any prejudice to the opposing party; (3) the feasability of curing any prejudice . . .; and (4) any other relevant circumstances." [*Thomas* ] at 570–71, 919 A.2d at 57–58; *see also Taliaferro v. State,* 295 Md. 376, 390–91, 456 A.2d 29, 37 (1983) (enumerating similar factors and stating that the factors "do not lend themselves to a compartmental analysis").

*Williams v. State,* 416 Md. 670, 698–99, 7 A.3d 1038, 1054 (2010). We have not required that statements addressing each of these factors be part of the record. The Court of Special Appeals held, in the present case, that the trial judge's ruling was an abuse of discretion because it concluded that the trial judge's statements leading up to the ruling contained "inherent contradictions" and that there was an erroneous "basis" for the ruling. *BEKA,* 190 Md.App. at 729, 989 A.2d at 1216.

BEKA's motion alleged that the County Board had failed to produce information substantiating its recoupment claim totaling $531,079.52 and that it was severely prejudiced by this withholding because it could not prepare a defense without the ability to determine the reasonableness of the pricing of material and labor in the discrete claims. During argument on the motion, BEKA claimed that it wanted the trial judge to strike two particular pieces of evidence that it alleged were filed untimely by the County Board, namely the August 20, 2008 filing of a Supplement to Answers to Interrogatories and a Supplement to Document Production. BEKA claimed that the documents did not substantiate the claim for back-charges because the documents did not contain the specificity required by the claims procedure under the contract. The County Board alleged, however, that BEKA had been in possession of the same information since commencement of litigation in February 2008 and therefore there was no prejudice. The County Board also noted that BEKA had not made any formal allegations of violation of the discovery rules, therefore, pursuant to *Food Lion v. McNeill,* 393 Md. 715, 904 A.2d 464 (2006), it should not be granted the extreme relief of exclusion of the evidence.

What is clear from the record is that the trial judge had issued three rulings to bar evidence of the County Board's recoupment claim prior to his ruling on the motion in limine and each time the ruling had favored BEKA. In granting BEKA's motion in limine to exclude the County Board's evidence of recoupment, the trial judge simply stated: "Well, I'll enter my ruling ... I'm going to bar any evidence of recoupment as an affirmative answer." No other evidence or rationale exists in the record explaining or elaborating on the trial judge's determination of the validity of BEKA's allegations regarding the discovery violations, prejudice, or waiver because of violation of the contract terms.

Based upon our review of the record, we conclude that there is scant commentary from the trial judge regarding his deliberation on BEKA's motion *in limine,* except to indicate his

belief that he had already ruled on the substantive issue of presentation of the recoupment claim by striking the Counter–Complaint and Amended Answer and that the County Board's counsel apparently annoyed the court with its circular presentation of its recoupment claim. The particular phrasing of the ruling, barring evidence of recoupment as "an affirmative answer," indicates that the trial judge may have been persuaded by BEKA's argument that it was prejudiced by failing to appreciate that information provided on "backcharges, credits and/or set-offs" at the beginning of litigation would be used as an "affirmative answer" or "affirmative defense."

Notwithstanding the alleged prejudice, there is no legal reasoning stated on the record supporting the trial judge's grant of this motion. The trial judge should have engaged in some factual and legal analysis regarding treatment of the recoupment claim pursuant to, or outside, of the contract. We agree with the Court of Special Appeals that, in spite of the trial judge's apparent fatigue with the issue, the Board should have been permitted to present evidence to support its recoupment claim because the record indicates that the Board put BEKA on notice of its claims during discovery. Moreover, BEKA never formally alleged that discovery was insufficient.

### IV. Interpretation of the Contract: "Delay Damages"

The Court of Special Appeals held that the trial court's final judgment must be reversed because of a failure to comply with Md. Rule 2–522(a) [24] and because it was impossible to know whether "delay damages" had been awarded in the judgment, when as a legal matter, delay damages were expressly precluded by the terms of the Contract. BEKA contends that the Court of Special Appeals erred in determining that the contract contained a broad "no-damages-for-delay" clause. There is no evidence in the record that the trial judge engaged in any legal analysis of the issue of delay

---

**24.** Maryland Rule 2–522(a) states that in a bench trial, "the judge, before or at the time judgment is entered, shall prepare and file or dictate into the record a brief statement of the reasons for the decision and the basis of determining any damages."

damages under the contract, ostensibly because BEKA did not present its claim for damages under Counts 23, 40, 42, 44 and 45 as "delay damages" even though in closing argument the County Board asserted that characterization.[25] Having been asked by the County Board on appeal, however, to determine if BEKA was entitled to "delay damages" under the contract, the intermediate appellate court reviewed the contract.

The interpretation of written contracts presents a question of law for the trial court, which an appellate court reviews de novo. *United Services v. Riley*, 393 Md. 55, 79, 899 A.2d 819, 833 (2006) (quoting *Towson University v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004)). "Courts in Maryland follow the law of objective interpretation of contracts, 'giving effect to the clear terms of the contract regardless of what the parties to the contract may have believed those terms to mean.'" *Riley*, 393 Md. at 79, 899 A.2d at 833 (quoting *Towson University*, 384 Md. at 78, 862 A.2d at 946–47).

The Court of Special Appeals held that § 8.3.1 of the Contract precluded BEKA from recovering "delay damages" from the County Board because the express language provided that "[e]xtension of time shall be Contractor's sole remedy

---

**25.** The disputed PCOs, categorized by the County Board as improper "delay damages," include: Counts 23, 40, 42, 44 and 45 of BEKA's Complaint. In a letter dated September 11, 2007, from the Architect to the County Board of Education, admitted into evidence as Defendant's Exhibit 40, explanations of denials of those PCOs were given. Count 23 (PCO 86) demanded $ 27,237 for costs incurred from March 24 to April 4, 2006 while waiting for debris to be removed from a ballfield and play area, which BEKA described as "idle costs due to suspension of work" and the Architect denied as not allowed pursuant to § 8.3.1 of the contract. In Count 40 (sewer), BEKA claimed $92,473 for costs allegedly incurred from February to August 2005 waiting for "changes to sanitary sewer design," part of which was paid and part denied as not permitted under the contract. In Count 42 (PCO 104), BEKA demanded $299,081 for costs allegedly incurred from November 21, 2005 through April 4, 2006 for "expansion of project", which was denied because of the appearance of a "delay claim" and submission as part of other PCOs. In Counts 44 (PCO 106) and 45 (PCO 107), BEKA claimed $29,558 for costs allegedly incurred waiting for direction on topsoil installation and completion of the playground, which were both denied as untimely and not allowed under the contract.

for delay." *BEKA,* 190 Md.App. at 734, 989 A.2d at 1219 (quoting § 8.3.1. of the disputed contract). BEKA asserted that even if § 8.3.1 barred delay damages, other provisions in the Contract modified the plain language of § 8.3.1 thereby expressing the parties mutual assent to accommodate delay damages. On that point, the intermediate appellate court held that "the parties nullified other provisions in the contract that may have allowed damages for costs incurred due to delay. Thus, the contract here clearly precluded BEKA from recovering damages for delay." *BEKA,* 190 Md.App. at 734, 989 A.2d at 1219–20. The Court of Special Appeals did not identify which "other provisions" had been nullified by the parties or how.

In response to BEKA's alternative assertions that its claims on Counts 23, 40, 42, 44 and 45, totaling $448,349, were not "delay damages" but "direct costs" recoverable under the contract, or that they were delay damages but the clause was unenforceable because of nefarious actions by the County Board, the intermediate appellate court determined that both were determinations appropriately made by the trier of fact, but that "the trial court made no factual findings" on the issues. *BEKA,* 190 Md.App. at 735, 989 A.2d at 1220. Specifically, the Court of Special Appeals held that:

we cannot ascertain if the court found: (1) as a matter of law, that the contract did not preclude delay damages; (2) as a matter of fact that the damages sought were not delay damages; (3) as a matter of the fact that the damages sought were for delay, but the Board's actions prevented enforcement of the no-damages-for-delay provisions; or (4) that some of the claims were not timely submitted pursuant to the terms of the contract.

*BEKA,* 190 Md.App. at 736, 989 A.2d at 1220. Therefore, lacking factual and legal conclusions upon which to assess whether it would be appropriate to affirm the trial court's judgment, the intermediate appellate court reversed the judgment and ordered a new trial. *See e.g., Della Ratta v. Dyas,* 414 Md. 556, 565, 996 A.2d 382, 387 (2010) ("Pursuant to Maryland Rule 8–131(c), where, as here, an action has been

tried without a jury, the appellate court will review the case on both the law and the evidence. We will not set aside the judgment of the trial court on the evidence unless clearly erroneous.") (citing Md. Rule 8–131(c)). We concur.

## V. Judgment

The trial judge announced the judgment of the court on the record as follows:

> Counsel, certainly we have fully aired the issue and I appreciate your advocacy on both sides, but here's the way I see it. I'm disallowing any claim for prejudgment interest which I'm going to do. I see the claim being $1,215,035 and I understand that the Board believes the proper amount is $505,487. There's much to be said on both sides on what has been a very unhappy performance of contract, and the public unfortunately has to pay the brunt of the cost of the contentious attitude of the Board in administering this money.
>
> I'm therefore going to compromise the claim and I'm going to allow $1,100,000 as the judgment against the County or the Board in final resolution of the claims and counterclaims. And that judgment will enter as of today and of course will draw interest from this point.

The parties contest the specificity with which the trial court must address the discrete claims pursuant to Md. Rule 2–522, which requires that the trial judge must "prepare and file or dictate into the record a brief statement of the reasons for the decision and the basis of determining any damages." Md. Rule 2–522(a). Before this Court, BEKA contends that the Court of Special Appeals has erred because the trial judge "is presumed to know, and properly apply, the law" and "the record is replete with competent and largely unrebutted evidence," so that the trial judge "properly used the jury verdict approach in determining the amount of damages to award to BEKA." Moreover, BEKA asserts that the trial judge's statement complies with Md. Rule 2–522(a) because the judge's "decision indicates that he took all of the claims and counterclaims into consideration and determined that Beka was enti-

tled to recover $1.1 million." To the contrary, the County Board has urged us to uphold the Court of Special Appeals's application of Md. Rule 2–522 in the instant case because "[s]eparate claims [49 counts in Beka's original complaint] for damages with specific evidence for each were presented[,]" and the "trial court did not state which of the 49 counts of Plaintiff's Complaint had been proven, nor did the court address the myriad of issues presented to it[.]"

The Court of Special Appeals held that the trial judge did not comply with Md. Rule 2–522(a), and it is apparent from the record that the trial judge entered the "compromise verdict" without any correlation between the grounds for BEKA's various claims for damages and the amount of damages ultimately awarded. *BEKA*, 190 Md.App. at 735, 989 A.2d at 1219–20. Because of the lack of documentation on how the trial judge resolved the issue of damages owed under the contract, the Court of Special Appeals reversed and remanded for a new trial. *BEKA*, 190 Md.App. at 735–36, 989 A.2d at 1220. Notwithstanding the Court of Special Appeals's rationale for its judgment, we conclude that the judgment with respect to recoupment and "delay damages" cannot stand because the County Board should have been permitted to introduce evidence on its "back-charges, credits, and set-offs" and the issue pertaining to an improper award of "delay damages" must be fully aired.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR WORCESTER COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. PETITIONER TO PAY 50% AND RESPONDENT TO PAY 50% OF THE COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS.**