*Board of Education for Wicomico County v. Rhonda B. Sturm*, No. 54, September Term, 2025.

**COLLATERAL ORDER DOCTRINE – EFFECTIVELY UNREVIEWABLE – SOVEREIGN IMMUNITY**

Sovereign immunity is an immunity from suit, not merely liability, and only the General Assembly may waive it. If the State, or one of its instrumentalities or agencies, must litigate a claim to final judgment before obtaining review of an interlocutory order denying an assertion of complete sovereign immunity, it will have irretrievably lost an important aspect of that immunity. Because only the General Assembly may waive sovereign immunity, an order denying an assertion of complete sovereign immunity is immediately appealable under the collateral order doctrine if the order presents a pure question of law and satisfies the other prongs of the doctrine.

**WAIVER OF SOVEREIGN IMMUNITY – APPROPRIATION OF FUNDS OR INDEPENDENT AUTHORITY TO RAISE FUNDS – CHILD VICTIMS ACT OF 2023 – COUNTY BOARDS OF EDUCATION – CLAIMS ARISING OUT OF PRE-JULY 1, 1971 CONDUCT**

An effective waiver of sovereign immunity requires both (1) specific legislative authorization subjecting the State to suit and (2) an appropriation of funds or authorization of an independent funding mechanism to pay judgments. The only mechanism the General Assembly has provided for county boards of education to satisfy tort judgments is by authorizing and requiring county boards to procure comprehensive liability insurance. The claim at issue arises from conduct occurring before July 1, 1971, when the General Assembly first authorized and required county boards of education to purchase comprehensive liability insurance to pay tort judgments. Assuming, without deciding, that, in enacting the Child Victims Act of 2023, the General Assembly specifically authorized suits against county boards of education based on conduct that occurred before July 1, 1971, the General Assembly has neither appropriated funding to pay judgments for such claims nor provided county boards with the authority to raise funds for that purpose. The Board of Education for Wicomico County thus retains sovereign immunity with respect to tort claims based on pre-July 1, 1971 conduct.

Circuit Court for Wicomico County
Case No. C-22-CV-25-000197
Argued:  April 9, 2026

IN THE SUPREME COURT

OF MARYLAND

No. 54

September Term, 2025

_____


BOARD OF EDUCATION FOR WICOMICO
COUNTY

v.

RHONDA B. STURM


_____

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

_____

Opinion by Fader, C.J.

_____

Filed: June 23, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

The Child Victims Act of 2023 ("CVA") removed all time limitations on bringing claims arising from child sexual abuse. Following passage of the CVA, the petitioner, Rhonda B. Sturm, brought tort claims against the Board of Education for Wicomico County for sexual abuse she alleges she suffered as a minor student between 1967 and June 1971. The Board moved to dismiss, claiming that it retains sovereign immunity for tort claims arising from conduct that occurred before July 1, 1971, the date on which the General Assembly first authorized it to obtain insurance that covered such claims. The Circuit Court for Wicomico County denied the Board's motion, and the Board appealed. The Appellate Court of Maryland dismissed the appeal for lack of jurisdiction. We must now determine: (1) whether the Board's interlocutory appeal of the circuit court's order may proceed; and, if so, (2) whether the Board retains sovereign immunity as to tort claims arising before July 1, 1971.

On the first issue, we hold that an order denying a motion to dismiss on the ground of complete sovereign immunity is immediately appealable under the collateral order doctrine. Sovereign immunity is an immunity from suit, not merely liability, that only the General Assembly may waive. If an arm of the State is forced to litigate a lawsuit to final judgment before obtaining review of an order denying its claim to sovereign immunity, the State will have lost the protection from suit that sovereign immunity provides in a manner that an appellate court cannot effectively remedy. Because a waiver of sovereign immunity is beyond the authority of the judiciary, an order denying a claim of complete sovereign immunity must be immediately appealable under the collateral order doctrine. We therefore recognize an exception to our holding in *Dawkins v. Baltimore City Police*

*Department*, 376 Md. 53 (2003), for orders denying claims of complete sovereign immunity made by the State and its agencies and instrumentalities.

On the second issue, we hold that the Board retains sovereign immunity with respect to tort claims based on conduct that occurred before July 1, 1971. A waiver of sovereign immunity requires both (1) specific authorization by the General Assembly to subject the State to suit and (2) an appropriation of funds or authorization of an independent funding mechanism to pay judgments. Here, assuming without deciding that the General Assembly, in enacting the CVA, specifically authorized suit against county boards of education based on conduct that occurred before July 1, 1971, it has neither appropriated funding to pay judgments for such claims nor authorized the county boards to raise funds for that purpose.

Accordingly, we will reverse the Appellate Court's order dismissing this appeal and remand the case to that court with instructions to remand to the circuit court with directions to grant the Board's motion to dismiss without prejudice.

## BACKGROUND

### A.     Legal Framework

County boards of education "are State agencies for purposes of sovereign immunity." *Bennett v. Harford County*, 485 Md. 461, 479 (2023); *see also Beka Indus., Inc. v. Worcester County Bd. of Educ.*, 419 Md. 194, 210 (2011) ("We affirm that a county board of education[] is a State agency entitled to [sovereign] immunity." (citation

2

modified)).[1]  In 1902, this Court held that county boards of education were not subject to tort suits because, although the General Assembly had provided that the boards may "sue and be sued," it had not provided them with authority "to raise money for the purpose of paying damages" or "with means to pay a judgment against them."  *Weddle v. Bd. of County Sch. Comm'rs of Frederick County*, 94 Md. 334, 344 (1902).  To the contrary, "[a]ll of their funds are appropriated by law to specific purposes[,] and they cannot be diverted by them."  *Id.*

Effective July 1, 1971, the General Assembly required county boards of education to procure comprehensive liability insurance, with limits up to $100,000 per injury, as "an educational purpose and as a valid educational expense."  1971 Md. Laws, Ch. 548.  In the same act, the General Assembly provided that county boards could still "rais[e] the defense of sovereign immunity to any amount in excess of the limit of liability."  *Id.*

In 2016, the General Assembly raised the minimum amount of insurance the county boards were required to procure from $100,000 per occurrence to $400,000 per occurrence.  2016 Md. Laws, Ch. 680; codified at Md. Code Ann., Educ. § 4-105 (2014 Repl.; 2016 Supp.).  At the same time, it increased the minimum amount above which the county boards

---

[1] Although the Court in *Beka Industries* referred on a few occasions to "governmental immunity," *see* 419 Md. at 210, 218, which is more often used to describe the immunity afforded to local governments operating in their governmental capacity, *see, e.g.*, *Mayor & City Council of Baltimore v. Varghese*, 493 Md. 1, 11-16 (2025), the Court was clearly referring to sovereign immunity.  The Court determined that the General Assembly had waived the sovereign immunity of county boards of education as to contract actions through its general waiver of sovereign immunity for such actions in § 12-103 of the State Government Article.  *Beka Indus.*, 419 Md. at 203, 206.

were authorized to assert sovereign immunity by the same amount. 2016 Md. Laws, Ch. 680; codified at Md. Code Ann., Cts. & Jud. Proc. § 5-518 (2020 Repl.).

In 2023, the General Assembly passed the CVA. 2023 Md. Laws, Ch. 6. As we explained in *Roman Catholic Archbishop of Washington v. Doe*, 489 Md. 514, 524 (2025), the CVA enacted several changes in Maryland law concerning tort actions for child sexual abuse. Two of those changes are relevant here. First, the CVA eliminated all time limitations on the filing of actions for alleged child sexual abuse. *Id.* Second, the CVA established specific limits on damages awards available in child sexual abuse cases. *Id.* With respect to claims against county boards of education, the CVA amended § 5-518(b) of the Courts and Judicial Proceedings Article to provide that a county board of education "may raise the defense of sovereign immunity" in child sexual abuse cases to "any amount above $890,000 to a single claimant for claims arising from an incident or occurrence." 2023 Md. Laws, Ch. 6, § 1; *see* Cts. & Jud. Proc. § 5-518(b)(2) (2013 Repl.; 2023 Supp.). A new § 5-518(c)(2) provided that liability for such claims "may not exceed $890,000 to a single claimant for injuries arising from an incident or occurrence." 2023 Md. Laws, Ch. 6, § 1; *see* Cts. & Jud. Proc. § 5-518(c)(2) (2013 Repl.; 2023 Supp.). Relatedly, the CVA amended § 4-105 of the Education Article to mandate minimum liability coverage of $890,000 for each occurrence for child sexual abuse claims, while maintaining the limit of $400,000 for each occurrence for all other claims. 2023 Md. Laws, Ch. 6; *see* Educ. § 4-105(b)(1) (2025 Repl.).

4

**B.    Factual and Procedural Background**

On May 28, 2025, Ms. Sturm filed a complaint against the Wicomico County Public Schools and the Wicomico County Board of Education in which she alleges that "Mr. Jones," a physical education and sixth grade teacher at North Salisbury Elementary School in Wicomico County, sexually abused her while she was a student at the school between 1967 and 1971. She alleges that despite receiving an "overwhelming number of reports of . . . sexual misconduct and abuse, neither the School, nor the District, nor the Board took any action to discipline, separate, or terminate Mr. Jones."

According to the Board's personnel records, the only male teacher with the last name Jones who taught at North Salisbury Elementary School during the relevant time taught there during the 1970-1971 school year. The Board accepted his resignation effective June 30, 1971.

The Board moved to dismiss, or in the alternative, for summary judgment asserting "absolute sovereign immunity" from tort claims before July 1, 1971. The Board argued that the General Assembly had not waived that immunity in the CVA and that the Board lacked any funding source to pay tort judgments arising from pre-July 1, 1971 conduct. Ms. Sturm opposed the motion, arguing that the General Assembly had retroactively waived the Board's sovereign immunity in the CVA and that the motion to dismiss was premature because there were genuine disputes regarding the Board's insurance coverage. The circuit court denied the Board's motion.

The Board appealed. In a supplemental jurisdictional statement filed with its Civil Appeal Information Report, the Board argued that the Appellate Court of Maryland could consider its interlocutory appeal under the collateral order doctrine. Ms. Sturm argued that the appeal was "premature and improper" and barred by this Court's decision in *Dawkins*. The Appellate Court dismissed the appeal as "not allowed by law."

We granted certiorari to determine whether the Board can appeal the interlocutory order under the collateral order doctrine and, if so, whether the General Assembly retroactively waived the Board's sovereign immunity as to child sexual abuse claims based on conduct occurring before July 1, 1971. *Bd. of Educ. for Wicomico County v. Sturm*, 493 Md. 62 (2026).

## DISCUSSION

### I. INTERLOCUTORY APPEALS FROM ORDERS REJECTING CLAIMS OF SOVEREIGN IMMUNITY

We first address the threshold jurisdictional question of whether the circuit court's interlocutory order denying the Board's motion to dismiss was immediately appealable. The Board argues that the order was appealable because sovereign immunity grants immunity from suit, not merely from liability, and so an order denying it is effectively unreviewable on appeal from a final judgment. The Board, and the State of Maryland as *amicus curiae*, contend that we should either overrule prior caselaw rejecting immediate appeals from interlocutory orders denying sovereign immunity or, in the alternative, recognize an exception to that caselaw. Ms. Sturm disagrees, but argues that we should nonetheless address the merits of this appeal because it raises a substantially important

6

issue.  Alternatively, she contends that any exception to prior caselaw should be "limited to appeals concerning immunity from suit under the CVA."

## A.    Standard of Review

"Whether an interlocutory order is appealable 'under the collateral order doctrine[] is a question of law that an appellate court reviews' without deference." *State v. Houston*, 493 Md. 279, 292 (2026) (quoting *Monarch Acad. Baltimore Campus, Inc. v. Baltimore City Bd. of Sch. Comm'rs*, 457 Md. 1, 40 (2017)).

## B.    Collateral Order Doctrine

We recently summarized the Appellate Court's limited authority to review interlocutory orders:

> The Appellate Court's power to decide appeals is derived from statute:  "a party may appeal from a final judgment entered in a civil or criminal case by a circuit court." Md. Code Ann., Cts. & Jud. Proc. § 12-301 (2020 Repl.).  An order is generally not a final judgment unless it fully adjudicates all claims in the case by and against all parties to the case.
>
> An interlocutory order—any order that is not a final judgment— ordinarily is not appealable until there is a final judgment.  The primary purpose of the final judgment rule is to prevent piecemeal appellate review of trial court decisions which do not terminate the litigation.  By requiring litigants to consolidate all claims of error at the end of a lawsuit, the rule eliminates a succession of separate appeals which would repeatedly interrupt and delay lower court proceedings.
>
> We have recognized three "exceptions" to the final judgment rule: (1) appeals from interlocutory orders specifically allowed by statute; (2) immediate appeals permitted under Maryland Rule 2-602; and (3) the collateral order doctrine.  The collateral order doctrine is not technically an exception to the final judgment rule; rather, it is a judicially created fiction, under which certain interlocutory orders are considered to be final judgments, even though such orders clearly are not final judgments.

7

*Houston*, 493 Md. at 292-93 (citation modified).

The Board argues that the circuit court's order denying its motion to dismiss is appealable under the collateral order doctrine. That "doctrine allows an immediate appeal to be taken from a 'very limited' class of non-final, interlocutory orders that are 'offshoots of the principal litigation in which they are issued' and that qualify, in effect, as 'final judgments without regard to the posture of the case.'" *Id.* at 293 (citation modified) (quoting *Stephens v. State*, 420 Md. 495, 502 (2011)). "To be appealable under the collateral order doctrine, an order must (1) conclusively determine the disputed question, (2) resolve an important issue, (3) resolve an issue that is completely separate from the merits of the action, and (4) be effectively unreviewable if the appeal had to await the entry of a final judgment." *Houston*, 493 Md. at 293 (quoting *In re M.P.*, 487 Md. 53, 68 (2024) (citation modified)). "Courts 'apply these elements very strictly in keeping with the narrow nature of the exception, which should apply only in extraordinary circumstances.'" *Id.*

The Board asserts, and Ms. Sturm does not contest, that the first three prongs of the collateral order doctrine are satisfied. The circuit court's order conclusively determined that the Board does not enjoy sovereign immunity from Ms. Sturm's claim, the Board's entitlement to sovereign immunity is an important issue, and it is completely separate from the merits. The point in dispute concerns the fourth prong, which is whether the circuit court's order would "be effectively unreviewable if the appeal had to await the entry of a final judgment." *Id.*

8

An interlocutory order is effectively unreviewable where a litigant's interest would be "irretrievably lost" if the litigant were forced to wait for final judgment. *Maryland Bd. of Physicians v. Geier*, 451 Md. 526, 552 (2017) (allowing an interlocutory appeal for executive privilege claims because such a right would be "irretrievably lost" if opposing litigants gained access to private information). We have said as much in several cases. *See Houston*, 493 Md. at 301 (finding an order disqualifying the State's Attorney in a criminal proceeding effectively unreviewable because if the government lost, double jeopardy would prohibit review, but if the government won, it would lack standing to appeal); *In re M.P.*, 487 Md. at 78-79 (holding that if a juvenile has a right to avoid a delinquency proceeding due to their age, requiring the juvenile to "undergo adjudication and disposition in the juvenile justice system before an appeal is permitted[]" would be effectively unreviewable); *In re O.P.*, 470 Md. 225, 251-52 (2020) (holding that because shelter care is "by definition [a] temporary" measure to immediately "deal with a serious risk to the child's safety and welfare during that period[,]" an order "denying continued shelter care would be effectively unreviewable" if appeal was delayed until final judgment of the child in need of assistance case).

The cases in which we have found the fourth prong of the collateral order doctrine satisfied each presented extraordinary circumstances. In most circumstances, Maryland appellate courts have found that interlocutory orders do not satisfy the fourth prong because they can be effectively reviewed following a final judgment. For example, orders causing a party to incur extra legal and administrative expenses are effectively reviewable on appeal

9

from a final judgment because they result only in "costs that are associated with any legal proceeding." *Spivery-Jones v. Receivership Est. of Trans Healthcare, Inc.*, 438 Md. 330, 360-61 (2014). The Appellate Court has held that orders granting motions to enforce settlement agreements are effectively reviewable on appeal from a final judgment because they do not pose a "serious risk of loss" if "deferred until after the final judgment." *Pattison v. Pattison*, 254 Md. App. 294, 311 (2022). And orders regarding motions to remove a case to another jurisdiction are effectively reviewable later because the defendant, if successful, would be entitled to a new trial. *Parrott v. State*, 301 Md. 411, 425-26 (1984). Similarly, ordinary discovery orders, *St. Joseph Med. Ctr., Inc. v. Cardiac Surgery Assocs., P.A.*, 392 Md. 75, 87 (2006), and class certification orders, *Ford Motor Co. v. Ferrell*, 188 Md. App. 704, 715 (2009), have been determined to be effectively reviewable upon final judgment.

In sum, as the Appellate Court has aptly explained, the test for determining whether an interlocutory order is effectively unreviewable on appeal from a final judgment is whether a party would suffer "irreparable harm" because the reversal of that interlocutory order "cannot undo what will have already taken place[.]" *In re Ferndale Volunteer Fire Co.*, 269 Md. App. 164, 198 n.8 (2026) (quoting *Milburn v. Milburn*, 142 Md. App. 518, 527 (2002)).

### C. Sovereign Immunity

The Board is entitled to sovereign immunity,[2] *Beka Indus.*, 419 Md. at 210, to the extent that the General Assembly has not waived the Board's immunity, *see Bd. of Educ. of Baltimore County v. Zimmer-Rubert*, 409 Md. 200, 205-06 (2009) (collecting cases).

Sovereign immunity is "one of the highest attributes of sovereignty[.]" *Katz v. Washington Suburban Sanitary Comm'n*, 284 Md. 503, 512 (1979). The doctrine "prohibits suits against the State or its entities absent its consent." *Magnetti v. Univ. of Maryland*, 402 Md. 548, 557 (2007). "[S]overeign immunity is firmly embedded in Maryland law, long recognized as applicable in actions—contract, tort, or otherwise—against the State of Maryland, its officers, and its units." *Id.* at 556-57 (collecting cases). "Sovereign immunity is an absolute immunity, and one that may be waived only directly or by necessary implication." *Comptroller of Maryland v. Badlia Bros., LLC*, 490 Md. 163, 171 (2025) (citation modified). We "construe legislative dilution of governmental immunity narrowly in order to avoid weakening the doctrine of sovereign immunity by judicial fiat." *Stern v. Bd. of Regents, Univ. Sys. of Maryland*, 380 Md. 691, 720 (2004).

---

[2] In the circuit court, the Board argued that it possessed sovereign immunity. On appeal before the Appellate Court and this Court, the Board has argued that it enjoys immunity that is "different" than "traditional sovereign immunity," based on its inability to divert funds from educational purposes to the payment of court judgments. However, as this Court has previously recognized, county boards of education enjoy traditional sovereign immunity. *Beka Indus.*, 419 Md. at 210. No party has raised any issue or argument that would cause us to revisit that determination here.

Accordingly, waivers of sovereign immunity "are strictly construed in favor of the State." *Brawner Builders, Inc. v. State Highway Admin.*, 476 Md. 15, 32 (2021).

Sovereign immunity protects the State not just from liability, but "from suit[.]" *See Katz*, 284 Md. at 507. "[T]he State's sovereign immunity not only protects the public treasury but also protects the State and its instrumentalities from standing trial." *State v. Hogg*, 311 Md. 446, 455 (1988), *overruled on other grounds by Dawkins v. Baltimore City Police Dep't*, 376 Md. 53, 64-65 (2003). Accordingly, we have consistently described sovereign immunity as encompassing the right to not have suits "maintained" against the sovereign. *Stern*, 380 Md. at 701 ("[W]hen a governmental agency or actor can, and does, avail itself of the doctrine of sovereign immunity, no contract or tort suit can be maintained thereafter against it unless the General Assembly has specifically waived the doctrine."); *see Magnetti*, 402 Md. at 558 ("Without a statutory waiver of the University's sovereign immunity, [the plaintiff] may not maintain his action against the University."); *Bd. of Trs. of Howard Cmty. Coll. v. John K. Ruff, Inc.*, 278 Md. 580, 590 (1976) (stating that "suits may not be maintained" unless sovereign immunity was waived and "money has been appropriated for the payment of such damages as may be awarded, or the agency itself is authorized to raise money for that purpose"); *Univ. of Maryland v. Maas*, 173 Md. 554, 558-59 (1938) (holding that sovereign immunity does not allow suits to be "maintained" against the State absent a specific waiver of the immunity). The United States Supreme Court recently explained the breadth of sovereign immunity as an immunity from suit at common law in *Geo Group, Inc. v. Menocal*:

12

Because an immunity applies irrespective of the merits, the protection it offers is not a simple finding of non-liability. Rather, the immunity ensures that the defendant need not answer for his conduct in court at all—that he avoids, in addition to liability, all the usual burdens of litigation, including a trial. And so we typically describe the protection in just that way: as an immunity from suit.

607 U.S. 438, 446 (2026) (citation modified).

### D. Legal Background Concerning Appealability of Interlocutory Orders Addressing Sovereign Immunity

We first addressed whether a trial court's denial of a motion to dismiss based on sovereign immunity is immediately appealable in *Hogg*. After readily concluding that the first three collateral order doctrine prongs were met, we proceeded to consider whether the order denying sovereign immunity would be effectively unreviewable after a final judgment. *Hogg*, 311 Md. at 455. Recognizing that sovereign immunity is an immunity from suit, and comparing it in that respect to a double jeopardy claim, we determined that "an order improperly failing to recognize the bar of sovereign immunity to a claim would effectively escape review if the sovereign were forced to stand trial on that claim and await final judgment before obtaining appellate review." *Id.* at 456-57. Accordingly, we held that "the collateral order doctrine permits immediate review . . . to determine whether the denial of [a] motion to dismiss . . . deprived the State . . . of the protection of sovereign immunity." *Id.* at 457.

A series of decisions following *Hogg* narrowed its reasoning and then its holding. In *Bunting v. State*, a case challenging a trial court's denial of a motion to dismiss charges based on an alleged violation of the Interstate Agreement on Detainers, we expressed

13

hesitation at the idea that the collateral order doctrine should be invoked any time an appellant claims a "'right' to avoid the trial itself," as it could effectively override the final judgment rule. 312 Md. 472, 479-82 (1988). Accordingly, we held that the Appellate Court was correct to dismiss that appeal.

Then, in *State v. Jett*, we determined that the State could not take an immediate appeal from an order denying a motion to dismiss a suit brought under the Maryland Tort Claims Act where the underlying dispute was over whether a county deputy sheriff was State personnel for whose actions the State could be liable. 316 Md. 248, 250-51 (1989). Although the basis for the State's motion to dismiss was its assertion that it had not waived sovereign immunity, we recognized a difference between that claim, which really raised a matter of agency law, and the assertion of "common law sovereign immunity in its full, unrestricted vigor" that had been at issue in *Hogg*. *Id.* at 255-57. Based on the breadth of the waiver in the Tort Claims Act, we observed that the focus had shifted from "protecting state officials and employees from disruption in the performance of their duties by defending against tort claims" to "protection of the public treasury by limiting the financial exposure" of the State. *Id.* at 257.

And in *Shoemaker v. Smith*, we upheld the Appellate Court's dismissal of an appeal from an interlocutory order denying a motion for summary judgment based on a claim of immunity under the Maryland Tort Claims Act. 353 Md. 143, 146 (1999). There, we reasoned that the underlying order failed to satisfy the third and fourth prongs of the

14

collateral order doctrine, because the issue was not a pure issue of law and because Tort

Claims Act immunity did not present an "extraordinary situation." *Id.* at 170.

Finally, in *Dawkins*, the Court held that an order denying a motion to dismiss on the

ground of sovereign immunity was not appealable under the collateral order doctrine,

overruling *Hogg*. *Dawkins*, 376 Md. at 54. The Court reviewed the history of its decisions

since *Hogg*, determined that *Hogg* itself "did not involve an extraordinary situation" to

which the collateral order doctrine should apply, and overruled that decision. *Id.* at 64-65.

The Court did not explain its conclusion that orders denying a defense of complete

sovereign immunity do not satisfy the collateral order doctrine. Nonetheless, the Court

concluded:

> As a general rule, interlocutory trial court orders rejecting defenses of
> common law sovereign immunity, governmental immunity, public official
> immunity, statutory immunity, or any other type of immunity, are not
> appealable under the Maryland collateral order doctrine. Whether, and under
> what circumstances, interlocutory orders overruling immunity defenses
> asserted by the Governor, Lieutenant Governor, Comptroller, Treasurer,
> Attorney General, Speaker of the House, President of the Senate, or judges
> as defined in Article IV, § 2, of the Maryland Constitution, are immediately
> appealable under the collateral order doctrine will have to be determined in
> any future cases that might arise. Interlocutory trial court orders overruling
> immunity claims by other government officials, employees, departments,
> agencies, entities, units, or subdivisions, or by private persons or entities, are
> not appealable under the doctrine.

*Id.* at 65 (citation modified). The Court thus stated a broad "general rule" that could be

tested in "future cases that might arise." *Id.*

15

## E. Analysis

We now hold that appeals from orders denying motions to dismiss on the ground of complete sovereign immunity satisfy the fourth prong of the collateral order doctrine. Accordingly, assuming they satisfy the other prongs and present pure issues of law, such orders are immediately appealable under that doctrine.

Two aspects of the defense of sovereign immunity together compel that conclusion. First, at least to the extent it has not been partially waived, sovereign immunity is an immunity from suit, not merely from liability. *Hogg*, 311 Md. at 455. As we explained in *Hogg*, that aspect of the State's sovereign immunity would be irretrievably lost if the State could not obtain review of a decision denying it until entry of a final judgment. *Id.* at 455-57. No appellate decision at that point could restore the State's right not to be subject to suit.

Second, only the General Assembly can waive the State's sovereign immunity. *Katz*, 284 Md. at 507-08. To the extent it is applied to orders rejecting claims of complete sovereign immunity, the rule in *Dawkins* amounts to a judicial abrogation of an important aspect of sovereign immunity. That is not within our power. *ARA Health Servs., Inc. v. Dep't of Pub. Safety & Corr. Servs.*, 344 Md. 85, 92 (1996) ("While the General Assembly may waive sovereign immunity either directly or by necessary implication, this Court has emphasized that dilution of the doctrine should not be accomplished by judicial fiat." (citation modified)); *Katz*, 284 Md. at 512-13 ("We are mindful that courts should not hold that immunity from suit, one of the highest attributes of sovereignty, has been waived,

16

except in cases of positive consent given, or by necessary and compelling implication. Therefore, we have consistently refused to judicially abrogate sovereign immunity, and we have stated that any waiver of immunity must come from the legislature." (citation modified)); *Jekofsky v. State Roads Comm'n*, 264 Md. 471, 474 (1972) (explaining that "it is desirable and in the public interest that any change in the doctrine of sovereign immunity should come from the legislative branch of the State Government rather than from the judicial branch" due to the "fiscal considerations, administrative difficulties[,] and other problems in balancing the rights of the State and its agencies" with the rights of "individual citizens"); *Duncan v. Koustenis*, 260 Md. 98, 104 (1970) ("Because the doctrine is so deeply ingrained in the law of Maryland, this Court has specifically declined to alter it without a legislative mandate.").

Before *Dawkins*, we had refused to judicially abrogate the immunity of a county board of education. In *Weisner v. Board of Education of Montgomery County*, parents of a child who had slipped on ice outside of an elementary school alleged that the Board of Education of Montgomery County failed to "meet its alleged duty to keep the sidewalk 'free of ice and hazardous conditions.'" 237 Md. 391, 392 (1965). The parents asked our Court to find that the doctrine of sovereign immunity was "wanting in logic and reason and run[s] directly contrary to the basic concepts of tort liability." *Id.* at 395. We refused, holding that any change in the sovereign immunity of county boards of education should not be "changed judicially," but legislatively. *Id.* As explained above, the General Assembly ultimately did so just a few years later, in 1971. *See* 1971 Md. Laws, Ch. 548.

17

Once again, we will not effectively abrogate any portion of the Board's sovereign immunity via judicial fiat. Consequently, we now make an exception to the rule in *Dawkins* for claims of complete sovereign immunity that meet all four prongs of the collateral order doctrine and can be resolved as a pure matter of law.[3]

In adopting this exception, we join many other courts in recognizing that orders denying claims of sovereign immunity meet the criteria of the collateral order doctrine. *See, e.g.*, *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 145 (1993) (holding that the benefits of immunities are lost if the litigation is allowed to "proceed[] past motion practice" and that state entities may pursue immediate appeals from orders denying them Eleventh Amendment immunity under the collateral order doctrine). The Supreme Court of Pennsylvania described the effects of litigating a denial of sovereign immunity to final judgment as follows:

> Because sovereign immunity protects government entities from a lawsuit itself, we conclude that a sovereign immunity defense is irreparably lost if appellate review of an adverse decision on sovereign immunity is postponed until after final judgment. Subjecting a governmental entity, which claims it is immune, to the legal process undermines the purposes of sovereign immunity. Engaging in litigation requires a governmental entity to expend

---

[3] Our holding is limited to claims of complete sovereign immunity. As discussed above, the sovereign immunity of county boards has been partially waived, including generally for all claims up to $400,000. Educ. § 4-105(b)(1)(ii) (2025 Repl.; 2025 Supp.). County boards may assert sovereign immunity only for claims above that amount. *Id.* § 4-105(b)(2)(i). For claims that fall within the scope of the partial waiver, therefore, the sovereign immunity county boards may assert is not an immunity from suit. It is, rather, an immunity only from liability exceeding $400,000. Thus, an interlocutory ruling denying a county board the benefit of the $400,000 limitation on the waiver of sovereign immunity would not be immediately appealable because it could be effectively reviewed following a final judgment.

18

taxpayer dollars on its defense and to divert employees' time from conducting government business. Further, forcing governmental entities to litigate claims from which they may be immune has a chilling effect on government policymaking.

*Brooks v. Ewing Cole, Inc.*, 259 A.3d 359, 373 (Pa. 2021) (citation modified). And the Supreme Court of Kentucky has found that immunity entitles the State to be free "from the burdens of defending the action, not merely . . . from liability," *Rowan County v. Sloas*, 201 S.W.3d 469, 474 (Ky. 2006), so "[o]bviously such an entitlement [to sovereign immunity] cannot be vindicated following a final judgment for by then the party claiming immunity has already borne the costs and burdens of defending the action[,]" *Breathitt County Bd. of Educ. v. Prater*, 292 S.W.3d 883, 886-87 (Ky. 2009).

The Supreme Court of New Mexico has stated that sovereign immunity "protects the important governmental interest of avoiding the burdens of a trial on the merits and that this interest will otherwise evade meaningful appellate review absent application of the collateral order doctrine." *Handmaker v. Henney*, 992 P.2d 879, 884 (N.M. 1999); *see also Washington Metro. Area Transit Auth. v. Nash-Flegler*, 272 A.3d 1171, 1178 (D.C. 2022) ("[A] denial of sovereign immunity is effectively unreviewable if it cannot be reviewed until after trial."); *Anderson v. City of Hopkins*, 393 N.W.2d 363, 364 (Minn. 1986) (holding that interlocutory orders are immediately appealable because an immunity from suit would be effectively lost if a government entity must erroneously litigate the case to final judgment).

The order here was appealable. We now turn to the merits of the appeal.

19

## II.    THE BOARD'S SOVEREIGN IMMUNITY AND THE CVA

The parties dispute whether the General Assembly retroactively waived the sovereign immunity of county boards of education in passing the CVA. Ms. Sturm argues that in enacting the CVA, the General Assembly retroactively waived the sovereign immunity of county boards of education up to $890,000 for all child sexual abuse claims, regardless of when the claims arose. Thus, she contends, the General Assembly waived sovereign immunity, up to $890,000 per occurrence, for her claim based on abuse that occurred before July 1, 1971. The Board argues that the General Assembly intended to eliminate only time limitations on bringing child sexual abuse claims, not to retroactively expand or create new waivers of sovereign immunity. Accordingly, the Board contends that it continues to enjoy complete sovereign immunity for claims that arose before July 1, 1971, the effective date of the General Assembly's first effective partial waiver of the sovereign immunity for county boards of education.

### A.    Standard of Review

Whether the State waived its sovereign immunity is a legal question, which we review without deference. *Badlia Bros.*, 490 Md. at 170.

### B.    Waivers of Sovereign Immunity

As discussed above, the State and its agencies are entitled to sovereign immunity absent a waiver by the General Assembly, *id.* at 167, and county boards of education are State agencies entitled to assert sovereign immunity to the extent it has not been waived, *Beka Indus.*, 419 Md. at 210. Our caselaw establishes that an effective waiver of sovereign

20

immunity requires two things. First, an effective waiver requires an unambiguous expression of specific legislative authority to waive sovereign immunity by the General Assembly, either directly or by necessary implication. *ARA Health Servs., Inc.*, 344 Md. at 92. Second, an effective waiver requires that the General Assembly have appropriated funds to pay resulting judgments or provided the entity at issue with independent authority to raise funds for that purpose. *Maas*, 173 Md. at 559 (holding that a suit may not be maintained against the government "if there are no funds available for the satisfaction of the judgment, or no power reposed in the agency for the raising of funds necessary to satisfy a recovery against it"). To ensure that we do not infringe on the General Assembly's exclusive right to waive sovereign immunity, we "construe legislative dilution of governmental immunity narrowly[,]" *Stern*, 380 Md. at 720, and construe waivers of sovereign immunity "strictly . . . in favor of the State," *Brawner Builders, Inc.*, 476 Md. at 32.

The first requirement for a waiver of sovereign immunity is an unambiguous waiver through specific legislative authority. The Maryland Code contains many examples of such waivers. Section 12-104 of the State Government Article provides that "the immunity of the State and of its units is waived as to a tort action, in a court of the State, to the extent provided" in that section. Md. Code Ann., State Gov't. § 12-104(a)(1) (2021 Repl.; 2025 Supp.). Section 12-201(a) of that Article prohibits the State, its officers, and its units from "rais[ing] the defense of sovereign immunity in a contract action, in a court of the State, based on a written contract that an official or employee executed" while acting within the

21

scope of their authority. Section 20-903 of the same Article provides that "[t]he State, its officers, and its units may not raise sovereign immunity as a defense against an award in an employment discrimination case under" the Maryland Fair Employment Practices Act. And, as discussed above, § 5-518(b) of the Courts and Judicial Proceedings Article specifically prescribes when a county board of education "may raise the defense of sovereign immunity," and § 5-518(c) identifies expressly when it "may not raise the defense of sovereign immunity." *See also, e.g.*, State Gov't § 9-122(g) (providing that the State "may not raise the defense of sovereign immunity" in a state court action for state lottery prize contract claims under $200,000 "[u]nless otherwise specifically provided"); Md. Code Ann., State Pers. & Pens. § 14-103 (2024 Repl.) (stating that the "State, its officers, and its units may not raise the defense of sovereign immunity in any administrative, arbitration, or judicial proceeding involving" certain employee grievance matters); Educ. § 13-207(a) (providing that "[t]he defense of sovereign immunity may not be available to [a constituent institution in the University System of Maryland], unless otherwise specifically provided . . . , in any administrative, arbitration, or judicial proceeding" involving certain employee grievance matters).

When interpreting such waivers, we hew closely to their plain language, careful to avoid expansion by "judicial fiat." *Stern*, 380 Md. at 720. Thus, in *ARA Health Services, Inc.*, in interpreting the State's waiver as to contract claims in State Government § 12-201, we held that the General Assembly had not waived the State's sovereign immunity as to a contract dispute where a purported contract modification was outside the scope of the

22

relevant State agency's authority.  344 Md. at 95.  Interpreting the same waiver in *Stern*, we determined that the State had not waived its sovereign immunity as to a contract that "was not signed by a duly authorized person."  380 Md. at 726.  And in *Williams v. Morgan State University*, we held that the General Assembly had not waived sovereign immunity for federal statutory claims in enacting the Maryland Tort Claims Act, where "the plain text of the [Act]'s waiver provision does not contain any indication that it applies to federal statutory claims."  484 Md. 534, 550 (2023).  We stated that "the General Assembly has demonstrated that it knows how to waive sovereign immunity[,]" *id.* at 554, and that "we would expect the General Assembly to speak plainly if it intended to subject the State to suit[,]" *id.* at 551.

When the General Assembly has unambiguously waived sovereign immunity, we have recognized and enforced those waivers.  For example, in *Zimmer-Rubert*, we considered whether the General Assembly's partial waiver of sovereign immunity for county boards of education in § 5-518 of the Courts and Judicial Proceedings Article extended to a claim under the Age Discrimination in Employment Act.  409 Md. at 215. Given that the waiver at that time extended to "*any* claim of $100,000 or less," *id.* (quoting Cts. & Jud. Proc § 5-518(c)) (emphasis added in *Zimmer-Rubert*), we held that it could not "reasonably be read to exclude certain categories of claims[,]" *Zimmer-Rubert*, 409 Md. at 215 (quoting *Zimmer-Rubert v. Bd. of Educ. of Baltimore County*, 179 Md. App. 589, 612 (2008).

The second requirement for a waiver of sovereign immunity is the appropriation of funds or the provision of independent authority to raise funds to pay a judgment resulting from the waiver. "[A] legislative waiver of sovereign immunity is ineffective unless . . . there are funds available for the satisfaction of the judgment[.]" *Katz*, 284 Md. at 513. "[W]hen the General Assembly expressly authorizes suits to be brought against one of the State's agencies, it is the giving of a positive consent and has the effect of waiving sovereign immunity[.]" *Bd. of Trs. of Howard Cmty. Coll. v. John K. Ruff, Inc.*, 278 Md. 580, 590 (1976). However, "it does not necessarily follow . . . that a money judgment may therefore be obtained. . . . An action for a money judgment may not be maintained unless funds had been appropriated for that purpose or the agency can provide funds by taxation." *Id.* (citation modified).

It is the plaintiff's burden to "establish the requisite appropriations or taxing authority." *Stern*, 380 Md. at 718. To do so, the plaintiff must show not that an agency has sufficient funds to satisfy a judgment, but that funds have been appropriated for that purpose or that the agency has the authority to raise funds for that purpose. Thus, in *Stern*, we held that the General Assembly had not effectively waived sovereign immunity for the University System of Maryland with respect to claims that it had illegally increased tuition mid-year, because no funds had been appropriated to pay refund claims. *Id.* at 715. In that case, the plaintiffs claimed that the System's balance sheet showed sufficient funds to pay judgments. *Id.* at 718. We held that because there had "long been serious limitations and outside controls placed on the distribution of funds" of the University System of Maryland,

24

the existence of "cash and cash equivalents" in an amount that would have been sufficient to pay the plaintiffs' claims did not satisfy their burden to show that funds had been appropriated to pay court judgments. *Id.* We contrasted that situation to the circumstances in *Frankel v. Board of Regents of University of Maryland System*, 361 Md. 298, 301 (2000), where the General Assembly had enacted "statutorily authorized refund policies" to pay refunds for the overpayment of tuition. *Stern*, 380 Md. at 714-15, 718.

Similarly, in *State v. Rich*, we held that the General Assembly had not effectively waived the State Highway Commission's sovereign immunity because the Commission could not "rightfully apply any of the funds in its hands to the payment of claims for personal injuries," nor was it "invested with any authority to raise money for that purpose." 126 Md. 643, 647 (1915). We said that the laws governing the budget of the Commission "effectually prevent . . . a conclusion" that it had a funding mechanism for court judgments, because the proceeds of loans it was empowered to obtain were "specifically devoted to the establishment and maintenance of improved highways[.]" *Id.* at 648.

When enabling full or partial waivers of sovereign immunity, the General Assembly has a variety of ways of making funding available to pay judgments. Perhaps most notably, § 12-203 of the State Government Article requires the Governor to "include in the budget bill money that is adequate to satisfy a final judgment that, after the exhaustion of the rights of appeal, is rendered against the State or any of its officers or units." *See Stern*, 380 Md. at 715 (identifying § 12-203 as a demonstration that "[t]he General Assembly is cognizant of how to specifically authorize the power to raise funds . . . for the purpose of paying

25

judgments arising from an express legislative waiver of immunity"). The General Assembly may also authorize other entities to raise funds for the purpose of paying judgments. Thus, after we had previously held that the General Assembly had not effectively waived the sovereign immunity of the Washington Suburban Sanitary Commission because it had failed to appropriate funding to pay judgments, the General Assembly authorized the agency to "certify to" the counties it served tax rates that would "produce an amount sufficient to satisfy said judgment or other sum including costs and counsel fees[.]" *Katz*, 284 Md. at 514. We held that was sufficient to provide the Commission with the authority to raise funds to pay judgments. *Id.*

## C. The Sovereign Immunity of County Boards of Education

This Court considered whether the General Assembly had effectively waived the sovereign immunity of county boards of education from tort suits in *Weddle v. Board of County School Commissioners of Frederick County*, 94 Md. 334 (1902). There, a father sued the Frederick County Board of Education for damages arising from the death of his daughter. *Id.* at 341. The father argued that because the General Assembly had permitted the county board to "sue and be sued," it had waived the defense of sovereign immunity. *Id.* at 344. We agreed that that language constituted a legislative authorization for suits against county boards on "matters within the scope of their duties and obligations." *Id.* However, we held that the General Assembly had not effectively waived sovereign immunity because the county boards had no power to "raise money for the purpose of paying damages, nor are they supplied with means to pay a judgment against them." *Id.* at

26

344-45. We observed that all funds held by the county board were appropriated to specific purposes and could not be diverted to others. *Id.* Moreover, we stated, Article VIII, § 3 of the Maryland Constitution "provides that the school fund of the state shall be kept inviolate and appropriated only to the purposes of education." *Id.* at 344.

We reached the same conclusion more than 60 years later in *Weisner*. There, parents of a student who broke her hip on an icy sidewalk outside a school sued the Board of Education of Montgomery County for failing to keep the sidewalk free of hazardous conditions. 237 Md. at 392. We held that the county board enjoyed sovereign immunity because the General Assembly "ha[d] not provided any funds for paying damages recovered in negligence actions by pupils[.]" *Id.* at 394 (quoting *Clauss v. Bd. of Educ. of Anne Arundel County*, 181 Md. 513, 524 (1943)). We contrasted that with the responsibility of the county boards to pay compensation to employees falling within the provisions of the Worker's Compensation Act, which we had found to be for an educational purpose in *Clauss*. *Weisner*, 237 Md. at 393-94. We concluded that "the rule of the *Weddle* case is too firmly established and has been too long unchanged by the Legislature in the face of repeated reminders of its role in the matter . . . to be changed judicially . . . . If there is to be a change, we think the Legislature should make it." *Id.* at 395.

The General Assembly did just that a few years later. *See Baltimore County v. RTKL Assocs. Inc.*, 380 Md. 670, 679-82 (2004) (reviewing the history of sovereign immunity waivers). Effective July 1, 1971, the General Assembly authorized and required county boards of education to procure comprehensive liability insurance, with limits of no more

27

than $100,000 "for each injury," as "an educational purpose and as a valid educational expense." 1971 Md. Laws, Ch. 548. The General Assembly provided that county boards could still "rais[e] the defense of sovereign immunity to any amount in excess of the limit of liability." *Id.*

The statutory scheme has undergone many changes since 1971, several of which are relevant here. In 1972, the General Assembly amended the predecessor to § 4-105 of the Education Article, requiring county boards of education to procure comprehensive liability insurance "in an amount not less than one hundred thousand dollars ($100,000.00) per occurrence," rather than insurance "limited to one hundred thousand dollars ($100,000) for each injury[.]" 1972 Md. Laws, Ch. 507. In 1974, the General Assembly added a provision expressly prohibiting county boards from "rais[ing] the defense of sovereign immunity in any claim of less than $100,000." 1974 Md. Laws, Ch. 792. In 2016, the General Assembly raised the minimum amount of insurance required from $100,000 per occurrence to $400,000 per occurrence, 2016 Md. Laws, Ch. 680, § 1; codified at Educ. § 4-105 (2014 Repl.; 2016 Supp.), and increased the minimum amount above which the county boards were authorized to assert sovereign immunity by the same amount, 2016 Md. Laws, Ch. 680, § 1; codified at Cts. & Jud. Proc. § 5-518 (2020 Repl.). In an uncodified § 2 of Chapter 680, the General Assembly provided that the act "shall be construed to apply only prospectively and may not be applied or interpreted to have any effect on or application to any cause of action before the effective date of this Act."

28

In 2023, the General Assembly passed the CVA. 2023 Md. Laws, Ch. 6. As relevant here, the CVA eliminated all time limitations on the filing of actions for alleged child sexual abuse and established specific limits on damages awards available in such cases. *See Roman Cath. Archbishop of Washington v. Doe*, 489 Md. 514, 524 (2025) (describing changes made in the CVA). With respect to child sexual abuse claims against county boards of education, the CVA: (1) amended § 4-105 of the Education Article to increase the limit of the comprehensive liability insurance county boards were required to carry from $400,000 to $890,000; and (2) amended § 5-518 of the Courts and Judicial Proceedings Article to increase to $890,000 the amount below which a county board is prohibited from asserting sovereign immunity. 2023 Md. Laws, Ch. 6, § 1. Unlike with its 2016 legislation, the General Assembly did not include a provision identifying the increase in available limits as prospective only.[4] The General Assembly also did not appropriate funds to pay judgments against county boards of education or authorize those boards to raise funds to pay such judgments other than through the procurement of insurance.

Following the changes made by the CVA, § 5-518(b) and (c) of the Courts and Judicial Proceedings Article read:

---

[4] No provision of the CVA expressly states whether the increase in limits available for child sexual abuse claims was intended to be retroactive or prospective. However, with respect to its elimination of time limitations, the CVA provides: "That this Act shall be construed to apply retroactively to revive any action that was barred by the application of the period of limitations applicable before October 1, 2023." 2023 Md. Laws Ch. 6, § 3.

(b) A county board of education, described under Title 4, Subtitle 1 of the Education Article, may raise the defense of sovereign immunity to:

(1) Any amount claimed above the limit of its insurance policy; or

(2) If self-insured or a member of a pool described under § 4-105(c)(1)(ii) of the Education Article:

(i) Except as provided in item (ii) of this item, any amount above $400,000; or

(ii) If the liability of the county board of education arises from a claim of sexual abuse, as defined in § 5-117 of this title, any amount above $890,000 to a single claimant for claims arising from an incident or occurrence.

(c) (1) Except as provided in paragraph (2) of this subsection, a county board of education may not raise the defense of sovereign immunity to any claim of $400,000 or less.

(2) If liability of a county board of education arises under a claim of sexual abuse, as defined in § 5-117 of this title, the liability may not exceed $890,000 to a single claimant for injuries arising from an incident or occurrence.

In 2025, the General Assembly amended these provisions again. 2025 Md. Laws, Ch. 104, § 1. Those amendments: (1) revised § 5-518(b) and (c) to provide that the amount above which a county board may assert the defense of sovereign immunity to a child sexual abuse claim filed before June 1, 2025 is $890,000 "to a single claimant for the claim or claims," rather than "to a single claimant for claims arising from an incident or occurrence"; (2) revised § 5-518(b) and (c) to lower the amount above which a county board may assert the defense of sovereign immunity to a child sexual abuse claim to $400,000 for claims filed after June 1, 2025; and (3) revised § 4-105 of the Education Article to require county boards to establish minimum liability coverage limits by reference

30

to "the amounts specified under § 5-518(c)(2) of the Courts Article" for child sexual abuse claims, rather than $890,000.  2025 Md. Laws, Ch. 104, § 1.

### D. Whether the CVA Effectively Waived the Board's Sovereign Immunity for Ms. Sturm's Claim

We now address whether the General Assembly, in passing the CVA, effectively waived the Board's sovereign immunity with respect to claims that arose before July 1, 1971.  The Board provides three bases for its argument that it retains its sovereign immunity as to such claims.  First, the Board contends that the CVA revived child sexual abuse claims that were barred by time limitations, but did not create new claims.  Thus, the Board argues, because it had complete sovereign immunity with respect to such claims before July 1, 1971, Ms. Sturm and those in her position had no claims that the CVA could revive.  Second, the Board contends that the CVA does not contain a retroactive waiver of sovereign immunity for county boards of education.  Third, the Board asserts that any waiver of sovereign immunity was not effective as to county boards of education for claims before July 1, 1971 because the General Assembly neither appropriated funds to pay judgments for such claims nor provided the Board with a mechanism to raise funds to pay such judgments.  After explaining why the Board's first argument lacks merit, we will resolve this case based on its third argument.  It is unnecessary to resolve the Board's second argument because, even if the General Assembly retroactively waived the Board's sovereign immunity in enacting the CVA, there is no appropriation or mechanism to raise funds to pay judgments for claims that arose before July 1, 1971.

31

The Board's first argument is based on the faulty premise that the availability of a defense of complete sovereign immunity extinguishes the claim. Sovereign immunity does not negate a cause of action; it precludes the cause of action from being pursued. *See, e.g.*, *Maryland State Highway Admin. v. Kim*, 353 Md. 313, 332 (1999) ("[Sovereign immunity] precludes a litigant from asserting an otherwise meritorious cause of action[.]"); *Charles E. Brohawn & Bros., Inc. v. Bd. of Trs. of Chesapeake Coll.*, 269 Md. 164, 165-66 (1973) ("By [the doctrine of sovereign immunity], a litigant is precluded from asserting an otherwise meritorious cause of action against this sovereign State or one of its agencies which has inherited its sovereign attributes, unless expressly waived by statute or by a necessary inference from such a legislative enactment."). Thus, as discussed above, we have consistently described sovereign immunity as encompassing the right to not have suits "maintained" against the sovereign. *See* discussion above at 12-13. We have never held that the existence of sovereign immunity extinguishes claims such that a subsequent waiver of immunity cannot revive them. *Cf. Roman Cath. Archbishop of Wash.*, 489 Md. at 532 ("Statutes of limitations . . . do not create any substantive rights in a defendant to be free from liability. They therefore are generally understood to extinguish the remedy for enforcing a right, not the right itself." (citation modified)).

For its argument to the contrary, the Board relies on *Doe v. New York City Department of Education*, 669 F. Supp. 3d 160, 162 (E.D.N.Y. 2023). However, that case is inapposite. In *Doe*, the court held that the New York Child Victims Act's retroactive elimination of statutes of limitations could not "revive" a cause of action for gender

32

discrimination under the New York State Human Rights Law based on conduct that occurred before that law included sex or gender as a protected class. *Id.* at 167-68. That law could not revive a claim that never existed. Here, although sovereign immunity—and, eventually, the applicable statute of limitations—precluded Ms. Sturm from pursuing her claim for sexual abuse against the Board, it did not negate the existence of that claim.

The Board's third argument is better taken. The Board argues that the only funding mechanism available to pay judgments against it is the insurance it has been authorized to procure under § 4-105 of the Education Article and its predecessor. Specifically, the Board argues that it lacked any authority to procure insurance before July 1, 1971, and its existing insurance policies do not provide coverage for torts arising before that date.

Ms. Sturm acknowledges that no funds have been appropriated to cover judgments in such cases and that the Board lacks independent taxing authority, but argues that Wicomico County could raise money to fund the judgments or that the Board could "move funds between" the categories of its budget to "satisfy any potential judgment." And even if not, Ms. Sturm contends that we should remand this case for further discovery to determine whether the Board's insurance would cover Ms. Sturm's claim.

The General Assembly has not appropriated any funds to pay judgments that might be entered against the Board in child sexual abuse lawsuits based on conduct that predates July 1, 1971. Nor has it provided the Board with independent taxing authority, required Wicomico County to provide the Board with funds to pay any such judgments, or enacted

33

a provision similar to § 12-203 of the State Government Article requiring the Governor to include funds to cover such judgments in the annual budget.

County boards of education receive funds from federal,[5] State, and county sources. The county boards allocate these funds for public education according to legislatively governed budget categories. Educ. §§ 5-101 – 5-102 (2025 Repl.). Section 5-105(a) of the Education Article requires that "[a]ll revenues received by a county board" are "spent by the board in accordance with the major categories of its annual budget as provided under § 5-101" of the Education Article. Section 5-101 requires county board budgets to include seven major categories, all but one of which contain multiple additional subcategories, *id.* § 5-101(b), along with "[a]ny other major category required by the State Board[,]" *id.* § 5-101(a)(1)(ii). The required major categories include: (1) "Current expense fund, estimated receipts," including revenue from local, State, and federal sources, *id.* § 5-101(b)(1); (2) "Current expense fund, requested appropriations," including for executive administration and support services, mid-level administration, instructional salaries, textbooks and other supplies, special education, student personnel services, health services, student transportation, operation of plant and equipment, maintenance of plant, fixed charges, food services, and capital outlay, *id.* § 5-101(b)(2); (3) "Current funds held in reserve," *id.* § 5-101(b)(3); (4) "The amount of any federal funds received in the last fiscal year," *id.* § 5-101(b)(4); (5) funds held in trust or dedicated to long-term obligations

---

[5] Neither party contends here that federal funds could be used to pay a state tort claim.

for retired employees, *id.* § 5-101(b)(5); (6) "School construction fund, estimated receipts," including revenue from local, State, and federal sources, bonds, and loans, *id.* § 5-101(b)(6); and (7) "School Construction Fund, requested appropriations," including land, buildings and equipment, school site improvements, remodeling, additional equipment, debt service, and amounts adequate to satisfy a final court judgment rendered against the board or its officers or employees, *id.* § 5-101(b)(7).

The Board's published 2025-2026 fiscal year budget identifies an approved budget of $310,790,110, funded by $55,807,903 from Wicomico County, $227,283,449 in State aid, $16,802,066 in federal aid, and the remainder from other sources.[6] The approved budget also identifies $310,790,110 in anticipated expenditures, including $191,924,902 for salaries and wages, $25,857,599 for contracted services, $11,203,556 for supplies and materials, $71,242,568 for other charges, $8,480,154 for equipment, and $2,081,331 for transfers.[7] Even beyond the constitutional requirement that "[t]he School Fund of the State shall be kept inviolate, and appropriated only to the purposes of education," Md. Const., Art. VIII, § 3, the parties have not pointed us to any authority the Board has to raise or disperse funds to pay tort judgments, nor have we found any. To the contrary, like the University System of Maryland in *Stern*, the Board has "serious limitations and outside

---

[6] Wicomico County Bd. of Educ., *Approved Consolidated Current Expense Budget Fiscal Year 2025-2026* 1, 14 (June 26, 2025) https://files-backend.assets.thrillshare.com/documents/asset/uploaded_file/3724/Wcps/503aaf9c-9155-42bf-a541-c9bec872f971/FY26_WCBOE_Approved_Budget.pdf, *archived at* https://perma.cc/5DG3-WAZY.

[7] *Id.*

controls placed on the distribution of funds[,]" 380 Md. at 718, that render the funds it possesses unavailable for the purpose of satisfying tort judgments.

Notwithstanding the absence of an appropriation or other funding mechanism, Ms. Sturm argues that: (1) the County must fund CVA judgments; (2) even if not, the Board could distribute its surplus County funds to the payment of tort judgments; and (3) the Board may have access to insurance that would cover Ms. Sturm's claim. We will discuss each argument in turn.

First, at oral argument, Ms. Sturm argued that the County is required to provide funds for the payment of CVA judgments by § 5-103(c)(1)(i) of the Education Article. Section 5-103(c) provides:

> (c) If a county council or board of county commissioners does not approve the amount requested in the budget that is more than the amount required by § 5-235(a)(1)(i) of this title:
>
> > (1) The county council or board of county commissioners:
> >
> > > (i) May not reduce the amount requested in the budget that is dedicated to satisfying a final court judgment; and
> > >
> > > (ii) Shall indicate in writing, within 15 days after the adoption of the budget, which major categories of the annual budget have been reduced and the reason for the reduction; and
> >
> > (2) The county board shall submit to the county governing body, within 30 days after the adoption of the budget, a report indicating how the alterations to the budget will be implemented, accompanied by reasonable supporting detail and analysis.[8]

---

[8] At the time of oral argument, § 5-103 included three references to § 5-202(d)(1)(i) of the Education Article, including the reference in subsection (c). At oral argument, the

36

Ms. Sturm argued that the reference to amounts "requested in the budget dedicated . . . to satisfying a final court judgment" suggests that the budget can include amounts required to pay tort judgments not covered by insurance. Ms. Sturm misapprehends the role of that section.

The General Assembly enacted the provision that is currently § 5-103(c)(1)(i) in response to this Court's opinion in *Beka Industries, Inc. v. Worcester County Board of Education*, 419 Md. 194 (2011). There, we ruled that the State was responsible for paying contract damages arising from a dispute between a construction company and the Worcester County School Board. *Id.* at 221. We held that the General Assembly had waived the sovereign immunity of county boards of education in contract actions under State Government § 12-201 and that § 12-203 of that Article required funding for all judgments entered pursuant to that waiver be included in the State's annual budget.[9] *Id.* The following year, in the annual Budget Reconciliation and Financing Act of 2012, the General Assembly made a series of changes that collectively were designed to place the responsibility for paying judgments resulting from construction contract claims on the county boards, rather than the State. 2012 Md. Laws, Ch. 1. Those changes included:

Court pointed out that there was, at that time, no such provision. In its annual corrective bill, the General Assembly changed the three statutory references to § 5-235(a)(1)(i) of the Education Article. 2026 Md. Laws, Ch. 153, § 1. The drafter's note stated that the reason for the change was an "[e]rroneous cross-reference" that had been introduced in 2021. *Id.*

[9] At that time, State Government § 12-203 provided: "To carry out this subtitle, the Governor shall include in the budget bill money that is adequate to satisfy a final judgment that, after the exhaustion of the rights of appeal, is rendered against the State or any of its officers or units." *Beka Indus.*, 419 Md. at 209 n.9.

37

- Adding the phrase "Except as provided in Title 5 of the Education Article" to the beginning of State Government § 12-203.

- In Education § 5-101(b)(4), which identifies the major category of board budgets for "School Construction Fund, requested appropriations," requiring board budgets to include "[a]n amount that is adequate to satisfy a final court judgment that, after exhaustion of the rights of appeal, is rendered against the county board of education or any of its officers or employees."

- In Education § 5-202(j), providing that if a final court judgment requires the State to include in the budget bill money to satisfy a judgment against a county board of education, the State could "deduct that amount from any other State funds that would otherwise be paid to the county board of education under this subtitle in the following fiscal year."

- And in Education § 5-103(c), providing that if a county did not approve certain funding levels identified in what was then Education § 5-202(d)(1)(i),[10] in reporting on which major categories of its budget have been reduced accordingly, the county could not reduce the amount requested in its budget dedicated to satisfying a final court judgment.

Education § 5-103(c)(1)(i) relates to construction contract damages awards, not tort judgments. It does not support Ms. Sturm's argument.

Second, Ms. Sturm argues that the Board is authorized to expend county funds on the payment of tort judgments because unlike State funds, the Constitution of Maryland does not prohibit the Board from spending funds provided to it by a county on non-educational purposes. Ms. Sturm's argument is at odds with our decision in *Weddle*, which did not distinguish between funds originally provided by the State or a county in

---

[10] The statutory cross-reference now included in Education § 5-103 is to Education § 5-235(a)(1)(i). That subsection provides: "Subject to subsection (o) of this section and beginning in fiscal year 2023, the county governing body shall levy and appropriate an annual tax sufficient to provide an amount of revenue for elementary and secondary public education purposes equal to the local share of major education aid as adjusted under § 5-239 of this subtitle."

determining that Article VIII, § 3 of the Constitution precluded a county board of education from using any of its funds to pay a tort judgment. 94 Md. at 344. Ms. Sturm argues that if *Weddle* stands for that proposition, it was wrongly decided. She contends that Article VIII, § 3, properly understood, relates only to funds provided to county boards of education by the State, not by a county, and so there is no constitutional restriction on the use of county funds to pay tort judgments.

We disagree. As an initial matter, we decided *Weddle* more than 120 years ago. It has guided the treatment of education funds held by county boards of education ever since, first by upholding the sovereign immunity of county boards against tort claims of any sort, and then by spurring the General Assembly to authorize the expenditure of county board funds to procure insurance as the mechanism to pay for tort claims as an educational expense. In all that time, the General Assembly has not passed an amendment to Article VIII, § 3 to limit it to funds originally provided by the State. Given the settled expectations arising from our decision in *Weddle*, we decline to revisit it now. Moreover, even if Article VIII, § 3 did not restrict a county board's use of funds originally provided by a county, that would still not result in either an appropriation of funds to pay tort judgments or the creation of a mechanism to raise such funds. The absence of a constitutional prohibition is not the

39

equivalent of an affirmative funding mechanism, which is what is required for an effective waiver of sovereign immunity.[11] *See, e.g.*, *Stern*, 380 Md. at 718.

Finally, Ms. Sturm argues that even if the Board did not have insurance at the time relevant to Ms. Sturm's allegations of child sexual abuse, it is still possible that one or more policies the Board later procured could respond to Ms. Sturm's allegations. Accordingly, she asks that if we disagree with her other arguments, we remand this case to the circuit court for discovery concerning the Board's insurance policies. The Board argues that although it no longer has possession of many of its older insurance policies, those policies would not have provided coverage for claims arising before July 1, 1971, and that it would be impossible today to obtain insurance coverage that would cover Ms. Sturm's claim.

As discussed, other than through insurance, the Board has no mechanism to fund judgments resulting from tort claims generally and child sexual abuse tort claims specifically. The only mechanism the General Assembly has ever provided for that purpose is by authorizing and requiring the Board to procure comprehensive liability insurance. The General Assembly first did so effective July 1, 1971. Ms. Sturm's

---

[11] Even if there were no constitutional restriction, the General Assembly still has statutorily restricted the expenditure of county funds to the approved major categories of its budget. Ms. Sturm argues that the Board could nonetheless fund tort judgments because Education § 5-105(b) allows the Board to transfer funds "within the major categories" of its budget after seeking approval from the county commissioners or the county council. But that authority does not amount to a funding mechanism because: (1) the Board may transfer its funds to only a pre-existing category of its budget, none of which provide for the payment of tort judgments, and (2) the ability to transfer existing funds is not an affirmative funding source, which is what is required for an effective waiver of sovereign immunity.

40

speculative suggestion that it is conceivable that one or more policies issued to the Board might possibly have provided a highly unusual retroactive date before the date of the first policy issued to the Board—covering a time period for which the Board indisputably enjoyed complete sovereign immunity until at least 2023—does not justify a remand.

Accordingly, we hold that even if the General Assembly, in passing the CVA, authorized a retroactive waiver of the sovereign immunity of county boards of education for claims based on conduct that occurred before July 1, 1971, that waiver was not effective because the General Assembly has not appropriated funds to pay resulting judgments or provided a mechanism for county boards to raise funds for that purpose. We will reverse the decision of the Appellate Court and remand this case to that court with instructions to reverse the circuit court's order denying the Board's motion to dismiss and remand the case to that court with instructions to grant the Board's motion and dismiss Ms. Sturm's complaint without prejudice. The dismissal should be without prejudice so that Ms. Sturm's claim may be revived if the General Assembly should, in the future, appropriate funds to pay judgments in claims like Ms. Sturm's or provide a funding mechanism for the Board to do so.

## CONCLUSION

First, we hold that the circuit court's order denying the Board's assertion of complete sovereign immunity is appealable under the collateral order doctrine.

Second, we hold that the General Assembly did not effectively waive the Board's sovereign immunity with respect to child sexual abuse claims where the conduct occurred

41

before July 1, 1971, because the General Assembly did not appropriate funds to pay resulting judgments or provide a mechanism for the Board to raise funds to pay such judgments.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE DECISION OF THE CIRCUIT COURT FOR WICOMICO COUNTY AND REMAND TO THAT COURT TO ENTER JUDGMENT CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY RESPONDENT.**